(Slip Opinion)          OCTOBER TERM, 2010          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MICHIGAN *v.* BRYANT

### CERTIORARI TO THE SUPREME COURT OF MICHIGAN

No. 09–150.   Argued October 5, 2010—Decided February 28, 2011

Michigan police dispatched to a gas station parking lot found Anthony
Covington mortally wounded.  Covington told them that he had been
shot by respondent Bryant outside Bryant's house and had then
driven himself to the lot.  At trial, which occurred before *Crawford* v.
*Washington*, 541 U. S. 36, and *Davis* v. *Washington*, 547 U. S. 813,
were decided, the officers testified about what Covington said.  Bry-
ant was found guilty of, *inter alia,* second-degree murder.   Ulti-
mately, the Michigan Supreme Court reversed his conviction, holding
that the Sixth Amendment's Confrontation Clause, as explained in
*Crawford* and *Davis,* rendered Covington's statements inadmissible
testimonial hearsay.

*Held:* Covington's identification and description of the shooter and the
location of the shooting were not testimonial statements because they
had a "primary purpose . . . to enable police assistance to meet an on-
going emergency."  *Davis*, 547 U. S., at 822.  Therefore, their admis-
sion at Bryant's trial did not violate the Confrontation Clause.  Pp. 5–
32.

  (a) In *Crawford,* this Court held that in order for testimonial evi-
dence to be admissible, the Sixth Amendment "demands . . . unavail-
ability and a prior opportunity for cross-examination."  541 U. S., at
68.  *Crawford* did not "spell out a comprehensive definition of 'testi-
monial,'" but it noted that testimonial evidence includes, among
other things, "police interrogations."  *Ibid.*  Thus, Sylvia Crawford's
statements during a station-house interrogation about a stabbing
were testimonial, and their admission when her husband, the ac-
cused, had "no opportunity" for cross-examination due to spousal
privilege made out a Sixth Amendment violation.  In *Davis* and
*Hammon,* both domestic violence cases, the Court explained that
"[s]tatements are nontestimonial when made in the course of police

interrogation under circumstances objectively indicating that the [interrogation's] primary purpose . . . is to enable police assistance to meet an ongoing emergency," but they "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the [interrogation's] primary purpose is to establish or prove past events potentially relevant to later criminal prosecution." 547 U. S., at 822. Thus, a recording of a 911 call describing an ongoing domestic disturbance was nontestimonial in *Davis,* where the victim's "elicited statements were necessary to be able to *resolve* [the ongoing] emergency," and the statements were not formal. *Id.,* at 827. But the statements in *Hammon* were testimonial, where the victim was interviewed after the event in a room separate from her husband and "deliberately recounted, in response to police questioning" the past events. *Id.,* at 830. Here, the context is a nondomestic dispute, with the "ongoing emergency" extending beyond an initial victim to a potential threat to the responding police and the public. This context requires additional clarification of what *Davis* meant by "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.,* at 822. Pp. 5–12.

  (b) To make the "primary purpose" determination, the Court must objectively evaluate the circumstances in which the encounter between the individual and the police occurs and the parties' statements and actions. Pp. 12–23.

    (1) The primary purpose inquiry is objective. The circumstances in which an encounter occurs—*e.g.*, at or near a crime scene versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. And the relevant inquiry into the parties' statements and actions is not the subjective or actual purpose of the particular parties, but the purpose that reasonable participants would have had, as ascertained from the parties' statements and actions and the circumstances in which the encounter occurred. P. 13.

    (2) The existence of an "ongoing emergency" at the time of the encounter is among the most important circumstances informing the interrogation's "primary purpose." See, *e.g., Davis*, 547 U. S., at 828–830. An emergency focuses the participants not on "prov[ing] past events potentially relevant to later criminal prosecution," *id.,* at 822, but on "end[ing] a threatening situation," *id.,* at 832. The Michigan Supreme Court failed to appreciate that whether an emergency exists and is ongoing is a highly context-dependent inquiry. An assessment of whether an emergency threatening the police and public is ongoing cannot narrowly focus on whether the threat to the first victim has been neutralized because the threat to the first responders and public may continue. The State Supreme Court also did not appreciate that

Syllabus

an emergency's duration and scope may depend in part on the type of weapon involved; the court below relied on *Davis* and *Hammon*, where the assailants used their fists, as controlling the scope of an emergency involving a gun. A victim's medical condition is important to the primary purpose inquiry to the extent that it sheds light on the victim's ability to have any purpose at all in responding to police questions and on the likelihood that any such purpose would be a testimonial one. It also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public. This does not mean that an emergency lasts the entire time that a perpetrator is on the loose, but trial courts can determine in the first instance when an interrogation transitions from nontestimonial to testimonial. Finally, whether an ongoing emergency exists is simply one factor informing the ultimate inquiry regarding an interrogation's "primary purpose." Another is the encounter's *informality*. Formality suggests the absence of an emergency, but informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent. The facts here— the questioning occurred in an exposed, public area, before emergency medical services arrived, and in a disorganized fashion— distinguish this case from *Crawford*'s formal station-house interrogation. Pp. 14–20.

(3) The statements and actions of both the declarant and interrogators also provide objective evidence of the interrogation's primary purpose. Looking to the contents of both the questions and the answers ameliorates problems that could arise from looking solely to one participant, since both interrogators and declarants may have mixed motives. Police officers' dual responsibilities as both first responders and criminal investigators may lead them to act with different motives simultaneously or in quick succession. And during an ongoing emergency, victims may want the threat to end, but may not envision prosecution. Alternatively, a severely injured victim may have no purpose at all in answering questions. Taking into account such injuries does not make the inquiry subjective. The inquiry still focuses on the understanding and purpose of a reasonable victim in the actual victim's circumstances, which prominently include the victim's physical state. Objectively ascertaining the primary purpose of the interrogation by examining the statements and actions of all participants is also consistent with this Court's prior holdings. *E.g.*, *Davis,* 547 U. S., at 822–823, n. 1. Pp. 20–23.

(c) Here, the circumstances of the encounter as well as the statements and actions of Covington and the police objectively indicate that the interrogation's "primary purpose" was "to enable police assistance to meet an ongoing emergency," 547 U. S., at 822. The cir-

cumstances of the interrogation involved an armed shooter, whose motive for and location after the shooting were unknown and who had mortally wounded Covington within a few blocks and a few minutes of the location where police found Covington. Unlike the emergencies in *Davis* and *Hammon*, this dispute's potential scope and thus the emergency encompassed a potential threat to the police and the public. And since this case involved a gun, the physical separation that was sufficient to end the emergency in *Hammon* was not necessarily sufficient to end the threat here. Informed by the circumstances of the ongoing emergency, the Court now turns to determining the "primary purpose of the interrogation" as evidenced by the statements and actions of Covington and the police. The circumstances of the encounter provide important context for understanding Covington's statements to the police. When he responded to their questions, he was lying in a gas station parking lot bleeding from a mortal gunshot wound, and his answers were punctuated with questions about when emergency medical services would arrive. Thus, this Court cannot say that a person in his situation would have had a "primary purpose" "to establish or prove past events potentially relevant to later criminal prosecution." *Ibid.* For their part, the police responded to a call that a man had been shot. They did not know why, where, or when the shooting had occurred; the shooter's location; or anything else about the crime. They asked exactly the type of questions necessary to enable them "to meet an ongoing emergency." *Ibid.* Nothing in Covington's responses indicated to the police that there was no emergency or that the emergency had ended. Finally, this situation is more similar to the informal, harried 911 call in *Davis* than to the structured, station-house interview in *Crawford*. The officers all arrived at different times; asked, upon arrival, what had happened; and generally did not conduct a structured interrogation. The informality suggests that their primary purpose was to address what they considered to be an ongoing emergency, and the circumstances lacked a formality that would have alerted Covington to or focused him on the possible future prosecutorial use of his statements. Pp. 23–32.

483 Mich. 132, 768 N. W. 2d 65, vacated and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, and ALITO, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. SCALIA, J., and GINSBURG, J., filed dissenting opinions. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–150

MICHIGAN, PETITIONER *v.* RICHARD PERRY BRYANT

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MICHIGAN

[February 28, 2011]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

At respondent Richard Bryant's trial, the court admitted statements that the victim, Anthony Covington, made to police officers who discovered him mortally wounded in a gas station parking lot. A jury convicted Bryant of, *inter alia*, second-degree murder. 483 Mich. 132, 137, 768 N. W. 2d 65, 67–68 (2009). On appeal, the Supreme Court of Michigan held that the Sixth Amendment's Confrontation Clause, as explained in our decisions in *Crawford* v. *Washington*, 541 U. S. 36 (2004), and *Davis* v. *Washington*, 547 U. S. 813 (2006), rendered Covington's statements inadmissible testimonial hearsay, and the court reversed Bryant's conviction. 483 Mich., at 157, 768 N. W. 2d, at 79. We granted the State's petition for a writ of certiorari to consider whether the Confrontation Clause barred the admission at trial of Covington's statements to the police. We hold that the circumstances of the interaction between Covington and the police objectively indicate that the "primary purpose of the interrogation" was "to enable police assistance to meet an ongoing emergency." *Davis*, 547 U. S., at 822. Therefore, Covington's identification

and description of the shooter and the location of the shooting were not testimonial statements, and their admission at Bryant's trial did not violate the Confrontation Clause. We vacate the judgment of the Supreme Court of Michigan and remand.

I

Around 3:25 a.m. on April 29, 2001, Detroit, Michigan police officers responded to a radio dispatch indicating that a man had been shot. At the scene, they found the victim, Anthony Covington, lying on the ground next to his car in a gas station parking lot. Covington had a gunshot wound to his abdomen, appeared to be in great pain, and spoke with difficulty.

The police asked him "what had happened, who had shot him, and where the shooting had occurred." 483 Mich., at 143, 768 N. W. 2d, at 71. Covington stated that "Rick" shot him at around 3 a.m. *Id.*, at 136, and n. 1, 768 N. W. 2d, at 67, and n. 1. He also indicated that he had a conversation with Bryant, whom he recognized based on his voice, through the back door of Bryant's house. Covington explained that when he turned to leave, he was shot through the door and then drove to the gas station, where police found him.

Covington's conversation with the police ended within 5 to 10 minutes when emergency medical services arrived. Covington was transported to a hospital and died within hours. The police left the gas station after speaking with Covington, called for backup, and traveled to Bryant's house. They did not find Bryant there but did find blood and a bullet on the back porch and an apparent bullet hole in the back door. Police also found Covington's wallet and identification outside the house.

At trial, which occurred prior to our decisions in *Crawford*, 541 U. S. 36, and *Davis*, 547 U. S. 813, the police officers who spoke with Covington at the gas station testi-

fied about what Covington had told them. The jury returned a guilty verdict on charges of second-degree murder, being a felon in possession of a firearm, and possession of a firearm during the commission of a felony.

Bryant appealed, and the Michigan Court of Appeals affirmed his conviction. No. 247039, 2004 WL 1882661 (Aug. 24, 2004) *(per curiam)*. Bryant then appealed to the Supreme Court of Michigan, arguing that the trial court erred in admitting Covington's statements to the police. The Supreme Court of Michigan eventually remanded the case to the Court of Appeals for reconsideration in light of our 2006 decision in *Davis*. 477 Mich. 902, 722 N. W. 2d 797 (2006). On remand, the Court of Appeals again affirmed, holding that Covington's statements were properly admitted because they were not testimonial. No. 247039, 2007 WL 675471 (Mar. 6, 2007) *(per curiam)*. Bryant again appealed to the Supreme Court of Michigan, which reversed his conviction. 483 Mich. 132, 768 N. W. 2d 65.

Before the Supreme Court of Michigan, Bryant argued that Covington's statements to the police were testimonial under *Crawford* and *Davis* and were therefore inadmissible. The State, on the other hand, argued that the statements were admissible as "excited utterances" under the Michigan Rules of Evidence. 483 Mich., at 142, and n. 6, 768 N. W. 2d, at 70, and n. 6. There was no dispute that Covington was unavailable at trial and Bryant had no prior opportunity to cross-examine him. The court therefore assessed whether Covington's statements to the police identifying and describing the shooter and the time and location of the shooting were testimonial hearsay for purposes of the Confrontation Clause. The court concluded that the circumstances "clearly indicate that the 'primary purpose' of the questioning was to establish the facts of an event that had *already* occurred; the 'primary purpose' was not to enable police assistance to meet an ongoing emergency." *Id.*, at 143, 768 N. W. 2d, at 71. The

court explained that, in its view, Covington was describing past events and as such, his "primary purpose in making these statements to the police . . . was . . . to tell the police who had committed the crime against him, where the crime had been committed, and where the police could find the criminal." *Id.*, at 144, 768 N. W. 2d, at 71. Noting that the officers' actions did not suggest that they perceived an ongoing emergency at the gas station, the court held that there was in fact no ongoing emergency. *Id.*, at 145–147, 768 N. W. 2d, at 71–73. The court distinguished the facts of this case from those in *Davis*, where we held a declarant's statements in a 911 call to be nontestimonial. It instead analogized this case to *Hammon* v. *Indiana,* which we decided jointly with *Davis* and in which we found testimonial a declarant's statements to police just after an assault. See 547 U. S., at 829–832. Based on this analysis, the Supreme Court of Michigan held that the admission of Covington's statements constituted prejudicial plain error warranting reversal and ordered a new trial. 483 Mich., at 151–153, 768 N. W. 2d, at 75–76. The court did not address whether, absent a Confrontation Clause bar, the statements' admission would have been otherwise consistent with Michigan's hearsay rules or due process.[1]

———————

[1] The Supreme Court of Michigan held that the question whether the victim's statements would have been admissible as "dying declarations" was not properly before it because at the preliminary examination, the prosecution, after first invoking both the dying declaration and excited utterance hearsay exceptions, established the factual foundation only for admission of the statements as excited utterances. The trial court ruled that the statements were admissible as excited utterances and did not address their admissibility as dying declarations. 483 Mich., at 153–154, 768 N. W. 2d, at 76–77. This occurred prior to our 2004 decision in *Crawford* v. *Washington*, 541 U. S. 36, where we first suggested that dying declarations, even if testimonial, might be admissible as a historical exception to the Confrontation Clause. *Id.*, at 56, n. 6; see also *Giles* v. *California*, 554 U. S. 353, 358–359 (2008). We

The majority's opinion provoked two dissents, both of which would have held Covington's statements admissible because they were made in circumstances indicating that their "primary purpose" was to assist police in addressing an ongoing emergency. *Id.*, at 157, 768 N. W. 2d, at 79 (opinion of Weaver, J.); *id.*, at 157–158, 768 N. W. 2d, at 79 (opinion of Corrigan, J.). Justice Corrigan's dissent explained that the time and space between "the onset of an emergency and statements about that emergency clearly must be considered in context." *Id.*, at 161, 768 N. W. 2d, at 80. Justice Corrigan concluded that the objective circumstances of Covington's interaction with police rendered this case more similar to the nontestimonial statements in *Davis* than to the testimonial statements in *Crawford*. 483 Mich., at 164, 768 N. W. 2d, at 82.

We granted certiorari to determine whether the Confrontation Clause barred admission of Covington's statements. 559 U. S. \_\_\_ (2010).

II

The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Fourteenth Amendment renders the Clause binding on the States. *Pointer* v. *Texas*, 380 U. S. 400, 403 (1965). In *Ohio* v. *Roberts*, 448 U. S. 56, 66 (1980), we explained that the confrontation right does not bar admission of statements of an unavailable witness if the statements "bea[r] adequate 'indicia of reliability.'"

—————

noted in *Crawford* that we "need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations." 541 U. S., at 56, n. 6. Because of the State's failure to preserve its argument with regard to dying declarations, we similarly need not decide that question here. See also *post*, p. \_\_ (GINSBURG, J., dissenting).

We held that reliability can be established if "the evidence falls within a firmly rooted hearsay exception," or if it does not fall within such an exception, then if it bears "particularized guarantees of trustworthiness." *Ibid.*

Nearly a quarter century later, we decided *Crawford* v. *Washington*, 541 U. S. 36. Petitioner Michael Crawford was prosecuted for stabbing a man who had allegedly attempted to rape his wife, Sylvia. Sylvia witnessed the stabbing, and later that night, after she and her husband were both arrested, police interrogated her about the incident. At trial, Sylvia Crawford claimed spousal privilege and did not testify, but the State introduced a tape recording of Sylvia's statement to the police in an effort to prove that the stabbing was not in self-defense, as Michael Crawford claimed. The Washington Supreme Court affirmed Crawford's conviction because it found Sylvia's statement to be reliable, as required under *Ohio* v. *Roberts*. We reversed, overruling *Ohio* v. *Roberts*. 541 U. S., at 60–68; see also *Davis*, 547 U. S., at 825, n. 4.

*Crawford* examined the common-law history of the confrontation right and explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." 541 U. S., at 50. We noted that in England, pretrial examinations of suspects and witnesses by government officials "were sometimes read in court in lieu of live testimony." *Id.*, at 43. In light of this history, we emphasized the word "witnesses" in the Sixth Amendment, defining it as "those who 'bear testimony.'" *Id.*, at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). We defined "testimony" as " ' [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " 541 U. S., at 51 (quoting Webster). We noted that "[a]n accuser who makes a formal statement to government officers bears testimony in a

sense that a person who makes a casual remark to an acquaintance does not." *Ibid.* We therefore limited the Confrontation Clause's reach to testimonial statements and held that in order for testimonial evidence to be admissible, the Sixth Amendment "demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.,* at 68. Although "leav[ing] for another day any effort to spell out a comprehensive definition of 'testimonial,'" *Crawford* noted that "at a minimum" it includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." *Ibid.* Under this reasoning, we held that Sylvia Crawford's statements in the course of police questioning were testimonial and that their admission when Michael Crawford "had no opportunity to cross-examine her" due to spousal privilege was "sufficient to make out a violation of the Sixth Amendment." *Ibid.*

In 2006, the Court in *Davis* v. *Washington* and *Hammon* v. *Indiana*, 547 U. S. 813, took a further step to "determine more precisely which police interrogations produce testimony" and therefore implicate a Confrontation Clause bar. *Id.,* at 822. We explained that when *Crawford* said that

> "'interrogations by law enforcement officers fall squarely within [the] class' of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial." *Davis*, 547 U. S., at 826.

We thus made clear in *Davis* that not all those questioned by the police are witnesses and not all "interrogations by

law enforcement officers," *Crawford*, 541 U. S., at 53, are
subject to the Confrontation Clause.[2]

   *Davis* and *Hammon* were both domestic violence cases.
In *Davis*, Michelle McCottry made the statements at issue
to a 911 operator during a domestic disturbance with
Adrian Davis, her former boyfriend. McCottry told the
operator, "'He's here jumpin' on me again,'" and, "'He's
usin' his fists.'" 547 U. S., at 817. The operator then
asked McCottry for Davis' first and last names and middle
initial, and at that point in the conversation McCottry
reported that Davis had fled in a car. *Id.*, at 818.
McCottry did not appear at Davis' trial, and the State
introduced the recording of her conversation with the 911
operator. *Id.*, at 819.

   In *Hammon*, decided along with *Davis*, police responded
to a domestic disturbance call at the home of Amy and
Hershel Hammon, where they found Amy alone on the
front porch. *Ibid.* She appeared " 'somewhat frightened,' "
but told them " 'nothing was the matter.' " *Ibid.* (quoting
*Hammon* v. *State*, 829 N. E. 2d 444, 446–447 (Ind. 2005)).
She gave the police permission to enter the house, where
they saw a gas heating unit with the glass front shattered
on the floor. One officer remained in the kitchen with
Hershel, while another officer talked to Amy in the living
room about what had happened. Hershel tried several
times to participate in Amy's conversation with the police
and became angry when the police required him to stay
separated from Amy. 547 U. S., at 819–820. The police
asked Amy to fill out and sign a battery affidavit. She
wrote: "'Broke our Furnace & shoved me down on the floor

──────────

   [2] We noted in *Crawford* that "[w]e use the term 'interrogation' in its
colloquial, rather than any technical legal, sense," and that "[j]ust as
various definitions of 'testimonial' exist, one can imagine various
definitions of 'interrogation,' and we need not select among them in this
case." 541 U. S., at 53, n. 4. *Davis* did not abandon those qualifica-
tions; nor do we do so here.

into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter.'" *Id.*, at 820. Amy did not appear at Hershel's trial, so the police officers who spoke with her testified as to her statements and authenticated the affidavit. *Ibid.* The trial court admitted the affidavit as a present sense impression and admitted the oral statements as excited utterances under state hearsay rules. *Ibid.* The Indiana Supreme Court affirmed Hammon's conviction, holding that Amy's oral statements were not testimonial and that the admission of the affidavit, although erroneous because the affidavit was testimonial, was harmless. *Hammon* v. *State*, 829 N. E. 2d, at 458–459.

To address the facts of both cases, we expanded upon the meaning of "testimonial" that we first employed in *Crawford* and discussed the concept of an ongoing emergency. We explained:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U. S., at 822.

Examining the *Davis* and *Hammon* statements in light of those definitions, we held that the statements at issue in *Davis* were nontestimonial and the statements in *Hammon* were testimonial. We distinguished the statements in *Davis* from the testimonial statements in *Crawford* on several grounds, including that the victim in *Davis* was "speaking about events *as they were actually happen-*

*ing*, rather than 'describ[ing] past events,' " that there was an ongoing emergency, that the "elicited statements were necessary to be able to *resolve* the present emergency," and that the statements were not formal. 547 U. S., at 827. In *Hammon*, on the other hand, we held that, "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct." *Id.*, at 829. There was "no emergency in progress." *Ibid.* The officer questioning Amy "was not seeking to determine . . . 'what is happening,' but rather 'what happened.' " *Id.*, at 830. It was "formal enough" that the police interrogated Amy in a room separate from her husband where, "some time after the events described were over," she "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *Ibid.* Because her statements "were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation," *id.*, at 832, we held that they were testimonial.

*Davis* did not "attemp[t] to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial." *Id.*, at 822.[3] The

---

[3] *Davis* explained that 911 operators "may at least be agents of law enforcement when they conduct interrogations of 911 callers," and therefore "consider[ed] their acts to be acts of the police" for purposes of the opinion. 547 U. S., at 823, n. 2. *Davis* explicitly reserved the question of "whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" *Ibid.* We have no need to decide that question in this case either because Covington's statements were made to police officers. The dissent also claims to reserve this question, see *post*, at 3, n. 1 (opinion of SCALIA, J.), but supports one of its arguments by relying on *King* v. *Brasier*, 1 Leach 199, 200, 168 Eng. Rep. 202, 202–203 (K. B. 1779), which involved statements made by a child to her mother—a private citizen—just after the child had been sexually assaulted. See also *Crawford* v. *Washington*, 541 U. S. 36, 69–70 (2004) (Rehnquist, C. J., concurring in judgment) (citing *King* v.

basic purpose of the Confrontation Clause was to "targe[t]" the sort of "abuses" exemplified at the notorious treason trial of Sir Walter Raleigh. *Crawford*, 541 U. S., at 51. Thus, the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial.[4] See *id.*, at 43–44. Even where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial. When, as in *Davis*, the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some state-

————————

*Brasier* for the different proposition that "out-of-court statements made by someone other than the accused and not taken under oath, unlike *ex parte* depositions or affidavits, were generally not considered substantive evidence upon which a conviction could be based").

[4] Contrary to the dissent's excited suggestion, nothing in this opinion casts "favorable light," *post*, at 11 (opinion of SCALIA, J.), on the conduct of Sir Walter Raleigh's trial or other 16th- and 17th-century English treason trials. The dissent is correct that such trials are "unquestionably infamous," *ibid.*, and our decision here confirms, rather than undermines, that assessment. See also n. 17, *infra*. For all of the reasons discussed in JUSTICE THOMAS' opinion concurring in the judgment, the situation presented in this case is nothing like the circumstances presented by Sir Walter Raleigh's trial. See *post*, p. __.

ments as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.[5]

Deciding this case also requires further explanation of the "ongoing emergency" circumstance addressed in *Davis*. Because *Davis* and *Hammon* arose in the domestic violence context, that was the situation "we had immediately in mind (for that was the case before us)." 547 U. S., at 826. We now face a new context: a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim. Thus, we confront for the first time circumstances in which the "ongoing emergency" discussed in *Davis* extends beyond an initial victim to a potential threat to the responding police and the public at large. This new context requires us to provide additional clarification with regard to what *Davis* meant by "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.*, at 822.

## III

To determine whether the "primary purpose" of an interrogation is "to enable police assistance to meet an ongoing emergency," *Davis*, 547 U. S., at 822, which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties.

───────────

[5] See *Davis* v. *Washington*, 547 U. S. 813, 823–824 (2006) (explaining the question before the Court as "whether the Confrontation Clause applies only to testimonial hearsay" and answering in the affirmative because "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter"). See also *post*, at 2 (SCALIA, J., dissenting).

A

The Michigan Supreme Court correctly understood that
this inquiry is objective.[6]  483 Mich., at 142, 768 N. W. 2d,
at 70.  *Davis* uses the word "objective" or "objectively" no
fewer than eight times in describing the relevant inquiry.
See 547 U. S., at 822, 826–828, 830–831, and n. 5; see, *e.g.*,
*id.*, at 826 ("The question before us in *Davis*, then, is
whether, objectively considered, the interrogation that
took place in the course of the 911 call produced testimo-
nial statements").  "Objectively" also appears in the defini-
tions of both testimonial and nontestimonial statements
that *Davis* established.  *Id.*, at 822.

An objective analysis of the circumstances of an encoun-
ter and the statements and actions of the parties to it
provides the most accurate assessment of the "primary
purpose of the interrogation."  The circumstances in which
an encounter occurs—*e.g.*, at or near the scene of the crime
versus at a police station, during an ongoing emergency
or afterwards—are clearly matters of objective fact.  The
statements and actions of the parties must also be objec-
tively evaluated.  That is, the relevant inquiry is not the
subjective or actual purpose of the individuals involved in
a particular encounter, but rather the purpose that rea-
sonable participants would have had, as ascertained from
the individuals' statements and actions and the circum-
stances in which the encounter occurred.[7]

––––––––––

[6] Bryant suggests that Michigan is arguing for "a subjective analysis
of the intent of the interrogator's questioning."  Brief for Respondent
12.  We do not read Michigan's brief to be arguing for a subjective
inquiry, and any such argument would be in error.  We do not under-
stand the dissent to disagree that the inquiry is objective.

[7] This approach is consistent with our rejection of subjective inquiries
in other areas of criminal law.  See, *e.g.*, *Whren* v. *United States*, 517
U. S. 806, 813 (1996) (refusing to evaluate Fourth Amendment reason-
ableness subjectively in light of the officers' actual motivations); *New
York* v. *Quarles*, 467 U. S. 649, 655–656, and n. 6 (1984) (holding that
an officer's subjective motivation is irrelevant to determining the

## B

As our recent Confrontation Clause cases have explained, the existence of an "ongoing emergency" at the time of an encounter between an individual and the police is among the most important circumstances informing the "primary purpose" of an interrogation. See *Davis*, 547 U. S., at 828–830; *Crawford*, 541 U. S., at 65. The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution."[8] *Davis*, 547 U. S., at 822. Rather, it focuses them on "end[ing] a threatening situation." *Id.*, at 832. Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

This logic is not unlike that justifying the excited utterance exception in hearsay law. Statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or

---

applicability of the public safety exception to *Miranda* v. *Arizona*, 384 U. S. 436 (1966)); *Rhode Island* v. *Innis*, 446 U. S. 291, 301–302 (1980) (holding that a police officer's subjective intent to obtain incriminatory statements is not relevant to determining whether an interrogation has occurred).

[8] The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause. The emergency is relevant to the "primary purpose of the interrogation" because of the effect it has on the parties' purpose, not because of its actual existence.

condition," Fed. Rule Evid. 803(2); see also Mich. Rule Evid. 803(2) (2010), are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood. See *Idaho* v. *Wright*, 497 U. S. 805, 820 (1990) ("The basis for the 'excited utterance' exception . . . is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation . . . "); 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence §803.04[1] (J. McLaughlin ed., 2d ed. 2010) (same); Advisory Committee's Notes on Fed. Rule Evid. 803(2), 28 U. S. C. App., p. 371 (same). An ongoing emergency has a similar effect of focusing an individual's attention on responding to the emergency.[9]

Following our precedents, the court below correctly began its analysis with the circumstances in which Covington interacted with the police. 483 Mich., at 143, 768

---

[9] Many other exceptions to the hearsay rules similarly rest on the belief that certain statements are, by their nature, made for a purpose other than use in a prosecution and therefore should not be barred by hearsay prohibitions. See, *e.g.*, Fed. Rule Evid. 801(d)(2)(E) (statement by a co-conspirator during and in furtherance of the conspiracy); 803(4) (Statements for Purposes of Medical Diagnosis or Treatment); 803(6) (Records of Regularly Conducted Activity); 803(8) (Public Records and Reports); 803(9) (Records of Vital Statistics); 803(11) (Records of Religious Organizations); 803(12) (Marriage, Baptismal, and Similar Certificates); 803(13) (Family Records); 804(b)(3) (Statement Against Interest); see also *Melendez-Diaz* v. *Massachusetts*, 557 U. S. __, __ (2009) (slip op., at 18) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial"); *Giles* v. *California*, 554 U. S., at 376 (noting in the context of domestic violence that "[s]tatements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules"); *Crawford*, 541 U. S., at 56 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy").

N. W. 2d, at 71. But in doing so, the court construed *Davis* to have decided more than it did and thus employed an unduly narrow understanding of "ongoing emergency" that *Davis* does not require.

First, the Michigan Supreme Court repeatedly and incorrectly asserted that *Davis* "defined" "'ongoing emergency.'" 483 Mich., at 147, 768 N. W. 2d, at 73; see also *id.*, at 144, 768 N. W. 2d, at 71–72. In fact, *Davis* did not even define the extent of the emergency in that case. The Michigan Supreme Court erroneously read *Davis* as deciding that "the statements made after the defendant stopped assaulting the victim and left the premises did *not* occur during an 'ongoing emergency.'" 483 Mich., at 150, n. 15, 768 N. W. 2d, at 75, n. 15. We explicitly explained in *Davis*, however, that we were asked to review only the testimonial nature of Michelle McCottry's initial statements during the 911 call; we therefore merely *assumed* the correctness of the Washington Supreme Court's holding that admission of her other statements was harmless, without deciding whether those subsequent statements were also made for the primary purpose of resolving an ongoing emergency. 547 U. S., at 829.

Second, by assuming that *Davis* defined the outer bounds of "ongoing emergency," the Michigan Supreme Court failed to appreciate that whether an emergency exists and is ongoing is a highly context-dependent inquiry. See Brief for United States as *Amicus Curiae* 20. *Davis* and *Hammon* involved domestic violence, a known and identified perpetrator, and, in *Hammon*, a neutralized threat. Because *Davis* and *Hammon* were domestic violence cases, we focused only on the threat to the victims and assessed the ongoing emergency from the perspective of whether there was a continuing threat *to them*. 547 U. S., at 827, 829–830.

Domestic violence cases like *Davis* and *Hammon* often have a narrower zone of potential victims than cases

involving threats to public safety. An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue. See 483 Mich., at 164, 768 N. W. 2d, at 82 (Corrigan, J., dissenting) (examining the threat to the victim, police, and the public); Brief for United States as *Amicus Curiae* 19–20 ("An emergency posed by an unknown shooter who remains at large does not automatically abate just because the police can provide security to his first victim").

The Michigan Supreme Court also did not appreciate that the duration and scope of an emergency may depend in part on the type of weapon employed. The court relied on *Davis* and *Hammon*, in which the assailants used their fists, as controlling the scope of the emergency here, which involved the use of a gun. The problem with that reasoning is clear when considered in light of the assault on Amy Hammon. Hershel Hammon was armed only with his fists when he attacked his wife, so removing Amy to a separate room was sufficient to end the emergency. 547 U. S., at 830–832. If Hershel had been reported to be armed with a gun, however, separation by a single household wall might not have been sufficient to end the emergency. *Id.*, at 819.

The Michigan Supreme Court's failure to focus on the context-dependent nature of our *Davis* decision also led it to conclude that the medical condition of a declarant is irrelevant. 483 Mich., at 149, 768 N. W. 2d, at 74 ("The Court said nothing at all that would remotely suggest that whether the victim was in need of medical attention was in any way relevant to whether there was an 'ongoing emergency'"). But *Davis* and *Hammon* did not present medical emergencies, despite some injuries to the victims. 547 U. S., at 818, 820. Thus, we have not previously considered, much less ruled out, the relevance of a victim's severe injuries to the primary purpose inquiry.

Taking into account the victim's medical state does not, as the Michigan Supreme Court below thought, "rende[r] non-testimonial" "all statements made while the police are questioning a seriously injured complainant." 483 Mich., at 149, 768 N. W. 2d, at 74. The medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one. The victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public.

As the Solicitor General's brief observes, Brief for United States as *Amicus Curiae* 20, and contrary to the Michigan Supreme Court's claims, 483 Mich., at 147, 768 N. W. 2d, at 73, none of this suggests that an emergency is ongoing in every place or even just surrounding the victim for the entire time that the perpetrator of a violent crime is on the loose. As we recognized in *Davis*, "a conversation which begins as an interrogation to determine the need for emergency assistance" can "evolve into testimonial statements." 547 U. S., at 828 (internal quotation marks omitted). This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs,[10] and exclude "the portions of any statement that

---

[10] Recognizing the evolutionary potential of a situation in criminal law is not unique to the Confrontation Clause context. We noted in

have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." *Id.*, at 829.

Finally, our discussion of the Michigan Supreme Court's misunderstanding of what *Davis* meant by "ongoing emergency" should not be taken to imply that the existence *vel non* of an ongoing emergency is dispositive of the testimonial inquiry. As *Davis* made clear, whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the "primary purpose" of an interrogation. Another factor the Michigan Supreme Court did not sufficiently account for is the importance of *informality* in an encounter between a victim and police. Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to "establish or prove past events potentially relevant to later criminal prosecution," *id.*, at 822, informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent. Cf. *id.*, at 826 (explaining that Confrontation Clause requirements cannot "readily be evaded" by the parties deliberately keeping the written product of an interrogation informal "instead of having the declarant sign a deposition"). The court below, however, too readily dismissed the informality of the circumstances in this case in a single brief footnote and in fact seems to have suggested that the encounter in this case was formal. 483 Mich., at 150, n. 16, 768 N. W. 2d, at 75, n. 16. As we

––––––––––

*Davis* that "[j]ust as, for Fifth Amendment purposes, 'police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect, . . . trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial." 547 U. S., at 829 (quoting *New York* v. *Quarles,* 467 U. S., at 658–659).

explain further below, the questioning in this case oc-
curred in an exposed, public area, prior to the arrival of
emergency medical services, and in a disorganized fashion.
All of those facts make this case distinguishable from
the formal station-house interrogation in *Crawford.* See
*Davis*, 547 U. S., at 827.

C

In addition to the circumstances in which an encounter
occurs, the statements and actions of both the declarant
and interrogators provide objective evidence of the pri-
mary purpose of the interrogation. See, *e.g.*, *Davis*, 547
U. S., at 827 ("[T]he nature of what was *asked and an-
swered* in *Davis*, again viewed objectively, was such that
the elicited statements were necessary to be able to *resolve*
the present emergency, rather than simply to learn (as in
*Crawford*) what had happened in the past" (first emphasis
added)).    The Michigan Supreme Court did, at least
briefly, conduct this inquiry.  483 Mich., at 144–147, 768
N. W. 2d, at 71–73.

As the Michigan Supreme Court correctly recognized,
*id.*, at 140, n. 5, 768 N. W. 2d, at 69, n. 5, *Davis* requires a
combined inquiry that accounts for both the declarant and
the interrogator.[11]   In many instances, the primary pur-

_____

[11] Some portions of *Davis*, however, have caused confusion about
whether the inquiry prescribes examination of one participant to the
exclusion of the other.  *Davis*' language indicating that a statement's
testimonial or nontestimonial nature derives from "the primary pur-
pose *of the interrogation*," 547 U. S., at 822 (emphasis added), could be
read to suggest that the relevant purpose is that of the interrogator.  In
contrast, footnote 1 in *Davis* explains, "it is in the final analysis the
declarant's statements, not the interrogator's questions, that the
Confrontation Clause requires us to evaluate."  *Id.*, at 822–823, n. 1.
Bryant draws on the footnote to argue that the primary purpose inquiry
must be conducted solely from the perspective of the declarant, and
argues against adoption of a purpose-of-the-interrogator perspective.
Brief for Respondent 10–13; see also Brief for Richard D. Friedman as
*Amicus Curiae* 5–15.  But this statement in footnote 1 of *Davis* merely

pose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers. To give an extreme example, if the police say to a victim, "Tell us who did this to you so that we can arrest and prosecute them," the victim's response that "Rick did it," appears purely accusatory because by virtue of the phrasing of the question, the victim necessarily has prosecution in mind when she answers.

The combined approach also ameliorates problems that could arise from looking solely to one participant. Predominant among these is the problem of mixed motives on the part of both interrogators and declarants. Police officers in our society function as both first responders and criminal investigators. Their dual responsibilities may mean that they act with different motives simultaneously or in quick succession. See *New York* v. *Quarles*, 467 U. S. 649, 656 (1984) ("Undoubtedly most police officers [deciding whether to give *Miranda* warnings in a possible emergency situation] would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect"); see also *Davis*, 547 U. S., at 839 (THOMAS, J., concurring in judgment in part and dissenting in part) ("In many, if not most, cases where police respond to a report of a crime, whether pursuant to a 911 call from the victim or otherwise, the purposes of an interrogation, viewed from the perspective of the police, are *both* to respond to the emer-

————————

acknowledges that the Confrontation Clause is not implicated when statements are offered "for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U. S., at 60, n. 9. An interrogator's questions, unlike a declarant's answers, do not assert the truth of any matter. The language in the footnote was not meant to determine *how* the courts are to assess the nature of the declarant's purpose, but merely to remind readers that it is the statements, and not the questions, that must be evaluated under the Sixth Amendment.

gency situation *and* to gather evidence").

Victims are also likely to have mixed motives when they make statements to the police. During an ongoing emergency, a victim is most likely to want the threat to her and to other potential victims to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant. A victim may want the attacker to be incapacitated temporarily or rehabilitated. Alternatively, a severely injured victim may have no purpose at all in answering questions posed; the answers may be simply reflexive. The victim's injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of addressing an ongoing emergency or for the purpose of future prosecution.[12] Taking into account a victim's injuries does not transform this objective inquiry into a subjective one. The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim—circumstances that prominently include the victim's physical state.

The dissent suggests, *post*, at 3–4 (opinion of SCALIA, J.), that we intend to give controlling weight to the "intentions of the police," *post*, at 4. That is a misreading of our opinion. At trial, the declarant's statements, not the interrogator's questions, will be introduced to "establis[h] the truth of the matter asserted," *Crawford*, 541 U. S., at 60, n. 9, and must therefore pass the Sixth Amendment test.

---

[12] In such a situation, the severe injuries of the victim would undoubtedly also weigh on the credibility and reliability that the trier of fact would afford to the statements. Cf. Advisory Committee's Notes on Fed. Rule Evid. 803(2), 28 U. S. C. App., p. 371 (noting that although the "theory" of the excited utterance exception "has been criticized on the ground that excitement impairs [the] accuracy of observation as well as eliminating conscious fabrication," it "finds support in cases without number" (citing 6 J. Wigmore, Evidence §1750 (J. Chadbourn rev. 1976))).

See n. 11, *supra.* In determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances. Even JUSTICE SCALIA concedes that the interrogator is relevant to this evaluation, *post*, at 3, and we agree that "[t]he identity of an interrogator, and the content and tenor of his questions," *ibid.*, can illuminate the "primary purpose of the interrogation." The dissent, see *post*, at 3–5 (opinion of SCALIA, J.), criticizes the complexity of our approach, but we, at least, are unwilling to sacrifice accuracy for simplicity. Simpler is not always better, and courts making a "primary purpose" assessment should not be unjustifiably restrained from consulting all relevant information, including the statements and actions of interrogators.

Objectively ascertaining the primary purpose of the interrogation by examining the statements and actions of all participants is also the approach most consistent with our past holdings. *E.g.*, *Davis*, 547 U. S., at 822–823, n. 1 (noting that "volunteered testimony" is still testimony and remains subject to the requirements of the Confrontation Clause).

IV

As we suggested in *Davis*, when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the

requirement of confrontation.[13]  As the context of this case brings into sharp relief, the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.

Applying this analysis to the facts of this case is more difficult than in *Davis* because we do not have the luxury of reviewing a transcript of the conversation between the victim and the police officers.  Further complicating our task is the fact that the trial in this case occurred before our decisions in *Crawford* and *Davis*.  We therefore review a record that was not developed to ascertain the "primary purpose of the interrogation."

We first examine the circumstances in which the interrogation occurred.  The parties disagree over whether there was an emergency when the police arrived at the gas station.  Bryant argues, and the Michigan Supreme Court accepted, 483 Mich., at 147, 768 N. W. 2d, at 73, that there was no ongoing emergency because "there . . . was no criminal conduct occurring.  No shots were being fired, no one was seen in possession of a firearm, nor were any witnesses seen cowering in fear or running from the scene."  Brief for Respondent 27.  Bryant, while conceding that "a serious or life-threatening injury creates a medical emergency for a victim," *id.*, at 30, further argues that a declarant's medical emergency is not relevant to the ongo-

––––––––––

[13] Of course the Confrontation Clause is not the only bar to admissibility of hearsay statements at trial.  State and federal rules of evidence prohibit the introduction of hearsay, subject to exceptions.  Consistent with those rules, the Due Process Clauses of the Fifth and Fourteenth Amendments may constitute a further bar to admission of, for example, unreliable evidence.  See *Montana* v. *Egelhoff*, 518 U. S. 37, 53 (1996) (plurality opinion) ("[E]rroneous evidentiary rulings can, in combination, rise to the level of a due process violation"); *Dutton* v. *Evans*, 400 U. S. 74, 96–97 (1970) (Harlan, J., concurring in result) ("[T]he Fifth and Fourteenth Amendments' commands that federal and state trials, respectively, must be conducted in accordance with due process of law" are the "standard" by which to "test federal and state rules of evidence").

ing emergency determination.

In contrast, Michigan and the Solicitor General explain that when the police responded to the call that a man had been shot and found Covington bleeding on the gas station parking lot, "they did not know who Covington was, whether the shooting had occurred at the gas station or at a different location, who the assailant was, or whether the assailant posed a continuing threat to Covington or others." Brief for United States as *Amicus Curiae* 15; Brief for Petitioner 16; see also *id.*, at 15 ("[W]hen an officer arrives on the scene and does not know where the perpetrator is, whether he is armed, whether he might have other targets, and whether the violence might continue at the scene or elsewhere, interrogation that has the primary purpose of establishing those facts to assess the situation is designed to meet the ongoing emergency and is nontestimonial").

The Michigan Supreme Court stated that the police asked Covington, "what had happened, who had shot him, and where the shooting had occurred." 483 Mich., at 143, 768 N. W. 2d, at 71. The joint appendix contains the transcripts of the preliminary examination, suppression hearing, and trial testimony of five officers who responded to the scene and found Covington. The officers' testimony is essentially consistent but, at the same time, not specific. The officers basically agree on what information they learned from Covington, but not on the order in which they learned it or on whether Covington's statements were in response to general or detailed questions. They all agree that the first question was "what happened?" The answer was either "I was shot" or "Rick shot me."[14]

------

[14] See App. 76 (testimony of Officer McCallister); *id.*, at 101, 113–114 (testimony of Sgt. Wenturine); *id.*, at 127, 131–133 (testimony of Officer Stuglin). Covington told them that Rick had shot him through the back door of Rick's house, *id.*, at 127–128 (testimony of Officer Stuglin), located at the corner of Pennsylvania and Laura, *id.*, at 102 (testimony

As explained above, the scope of an emergency in terms of its threat to individuals other than the initial assailant and victim will often depend on the type of dispute involved. Nothing Covington said to the police indicated that the cause of the shooting was a purely private dispute or that the threat from the shooter had ended. The record reveals little about the motive for the shooting. The police officers who spoke with Covington at the gas station testified that Covington did not tell them what words Covington and Rick had exchanged prior to the shooting.[15] What Covington did tell the officers was that he fled Bryant's back porch, indicating that he perceived an ongoing threat.[16] The police did not know, and Covington did not tell them, whether the threat was limited to him. The

––––––––––

of Sgt. Wenturine), and that Covington recognized Rick by his voice, *id.*, at 128 (testimony of Officer Stuglin). Covington also gave them a physical description of Rick. *Id.*, at 84–85, 93–94 (testimony of Officer McAllister); *id.*, at 103, 115 (testimony of Sgt. Wenturine); *id.*, at 134 (testimony of Officer Stuglin).

[15] See *id.*, at 114 ("Q Did he tell you what Rick said? A He said they were having a conversation. Q Did he tell you what Rick said? A He did not" (testimony of Sgt. Wenturine) (paragraph breaks omitted)); see also *id.*, at 79 (testimony of Officer McAllister); *id.*, at 128 (testimony of Officer Stuglin).

[16] See *id.*, at 127–128 ("A He said he'd went up, he went up to the back door of a house; that a person he said he knew, and he was knocking and he was knocking on the door he said he'd talked to somebody through the door. He said he recognized the voice. Q Did he say who it was that he recognized the voice of? A That's when he told me it was, he said it was Rick a/k/a Buster. Q And did he say what the conversation was about at the door? A I don't, I don't believe so. Q All right. And did he say what happened there, whether or not they had a conversation or not, did he say what ended up happening? A He said what happened was that he heard a shot and then he started to turn to get off the porch and then another one and then that's when he was hit by a gunshot" (testimony of Officer Stuglin) (paragraph breaks omitted)). Unlike the dissent's apparent ability to read Covington's mind, *post*, at 6 (opinion of SCALIA, J.), we rely on the available evidence, which suggests that Covington perceived an ongoing threat.

potential scope of the dispute and therefore the emergency in this case thus stretches more broadly than those at issue in *Davis* and *Hammon* and encompasses a threat potentially to the police and the public.

This is also the first of our post-*Crawford* Confrontation Clause cases to involve a gun. The physical separation that was sufficient to end the emergency in *Hammon* was not necessarily sufficient to end the threat in this case; Covington was shot through the back door of Bryant's house. Bryant's argument that there was no ongoing emergency because "[n]o shots were being fired," Brief for Respondent 27, surely construes ongoing emergency too narrowly. An emergency does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim. If an out-of-sight sniper pauses between shots, no one would say that the emergency ceases during the pause. That is an extreme example and not the situation here, but it serves to highlight the implausibility, at least as to certain weapons, of construing the emergency to last only precisely as long as the violent act itself, as some have construed our opinion in *Davis*. See Brief for Respondent 23–25.

At no point during the questioning did either Covington or the police know the location of the shooter. In fact, Bryant was not at home by the time the police searched his house at approximately 5:30 a.m. 483 Mich., at 136, 768 N. W. 2d, at 67. At some point between 3 a.m. and 5:30 a.m., Bryant left his house. At bottom, there was an ongoing emergency here where an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded Covington within a few blocks and a few minutes of the location where the police found Covington.[17]

—————

[17] It hardly bears mention that the emergency situation in this case is readily distinguishable from the "treasonous conspiracies of unknown

This is not to suggest that the emergency continued until Bryant was arrested in California a year after the shooting. *Id.*, at 137, 768 N. W. 2d, at 67. We need not decide precisely when the emergency ended because Covington's encounter with the police and all of the statements he made during that interaction occurred within the first few minutes of the police officers' arrival and well before they secured the scene of the shooting—the shooter's last known location.

We reiterate, moreover, that the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry; rather, the ultimate inquiry is whether the "primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency." *Davis*, 547 U. S., at 822. We turn now to that inquiry, as informed by the circumstances of the ongoing emergency just described. The circumstances of the encounter provide important context for understanding Covington's statements to the police. When the police arrived at Covington's side, their first question to him was "What happened?"[18] Covington's response was either "Rick shot me" or "I was shot," followed very quickly by an identification of "Rick"

---

scope, aimed at killing or overthrowing the king," *post*, at 11, about which JUSTICE SCALIA's dissent is quite concerned.

[18] Although the dissent claims otherwise, *post*, at 7 (opinion of SCALIA, J.), at least one officer asked Covington something akin to "how was he doing." App. 131 (testimony of Officer Stuglin) ("A I approached the subject, the victim, Mr. Covington, on the ground and had asked something like what happened or are you okay, something to that line. . . . Q So you asked this man how are you, how are you doing? A Well, basically it's, you know, what's wrong, you know" (paragraph breaks omitted)). The officers also testified about their assessment of Covington's wounds. See *id.*, at 35 (suppression hearing testimony of Officer Brown) ("[H]e had blood . . . on the front of his body"); *id.*, at 75 (testimony of Officer McCallister) ("It appeared he had a stomach wound of a gunshot"); *id.*, at 132 (testimony of Officer Stuglin) ("Q Did you see the wound? A Yes, I did. Q You had to move some clothing to do that? A Yes" (paragraph breaks omitted)).

as the shooter. App. 76.  In response to further questions, Covington explained that the shooting occurred through the back door of Bryant's house and provided a physical description of the shooter.  When he made the statements, Covington was lying in a gas station parking lot bleeding from a mortal gunshot wound to his abdomen.  His answers to the police officers' questions were punctuated with questions about when emergency medical services would arrive.  *Id.*, at 56–57 (suppression hearing testimony of Officer Brown).  He was obviously in considerable pain and had difficulty breathing and talking.  *Id.*, at 75, 83–84 (testimony of Officer McCallister); *id.*, at 101, 110–111 (testimony of Sgt. Wenturine); *id.*, at 126, 137 (testimony of Officer Stuglin).  From this description of his condition and report of his statements, we cannot say that a person in Covington's situation would have had a "primary purpose" "to establish or prove past events potentially relevant to later criminal prosecution."  *Davis*, 547 U. S., at 822.

For their part, the police responded to a call that a man had been shot.  As discussed above, they did not know why, where, or when the shooting had occurred.  Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred.[19]

——————

[19] Contrary to the dissent's suggestion, *post*, at 8 (opinion of SCALIA, J.), and despite the fact that the record was developed prior to *Davis*' focus on the existence of an "ongoing emergency," the record contains some testimony to support the idea that the police officers were concerned about the location of the shooter when they arrived on the scene and thus to suggest that the purpose of the questioning of Covington was to determine the shooter's location.  See App. 136 (testimony of Officer Stuglin) (stating that upon arrival officers questioned the gas station clerk about whether the shooting occurred in the gas station parking lot and about concern for safety); see also *ibid.* (testimony of Officer Stuglin) ("Q . . . So you have some concern, there may be a person with a gun or somebody, a shooter right there in the immediate area?  A Sure, yes.  Q And you want to see that that area gets secured?

The questions they asked—"what had happened, who had shot him, and where the shooting occurred," 483 Mich., at 143, 768 N. W. 2d, at 71—were the exact type of questions necessary to allow the police to " 'assess the situation, the threat to their own safety, and possible danger to the potential victim' " and to the public, *Davis*, 547 U. S., at 832 (quoting *Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U. S. 177, 186 (2004)), including to allow them to ascertain "whether they would be encountering a violent felon,"[20] *Davis*, 547 U. S., at 827. In other words, they solicited the information necessary to enable them "to meet an ongoing emergency." *Id.*, at 822.

Nothing in Covington's responses indicated to the police that, contrary to their expectation upon responding to a call reporting a shooting, there was no emergency or that a prior emergency had ended. Covington did indicate that he had been shot at another location about 25 minutes earlier, but he did not know the location of the shooter at the time the police arrived and, as far as we can tell from the record, he gave no indication that the shooter, having shot at him twice, would be satisfied that Covington was only wounded. In fact, Covington did not indicate any possible motive for the shooting, and thereby gave no reason to think that the shooter would not shoot again if he arrived on the scene. As we noted in *Davis*, "initial inquiries" may "*often* . . . produce nontestimonial state-

---

A Correct. Q For your safety as well as everyone else? A Correct" (paragraph breaks omitted)); *id.*, at 82 (testimony of Officer McCallister). But see *id.*, at 83 (cross-examination of Officer McAllister) ("Q You didn't, you didn't look around and say, gee, there might be a shooter around here, I better keep an eye open? A I did not, no. That could have been my partner I don't know" (paragraph breaks omitted)).

[20] *Hiibel*, like our post-*Crawford* Confrontation Clause cases, involved domestic violence, which explains the Court's focus on the security of the victim and the police: they were the only parties potentially threatened by the assailant. 542 U. S., at 186 (noting that the case involved a "domestic assault").

ments." *Id.*, at 832. The initial inquiries in this case resulted in the type of nontestimonial statements we contemplated in *Davis*.

Finally, we consider the informality of the situation and the interrogation. This situation is more similar, though not identical, to the informal, harried 911 call in *Davis* than to the structured, station-house interview in *Crawford*. As the officers' trial testimony reflects, the situation was fluid and somewhat confused: the officers arrived at different times; apparently each, upon arrival, asked Covington "what happened?"; and, contrary to the dissent's portrayal, *post*, at 7–9 (opinion of SCALIA, J.), they did not conduct a structured interrogation. App. 84 (testimony of Officer McCallister) (explaining duplicate questioning, especially as to "what happened?"); *id.*, at 101–102 (testimony of Sgt. Wenturine) (same); *id.*, at 126–127 (testimony of Officer Stuglin) (same). The informality suggests that the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted Covington to or focused him on the possible future prosecutorial use of his statements.

Because the circumstances of the encounter as well as the statements and actions of Covington and the police objectively indicate that the "primary purpose of the interrogation" was "to enable police assistance to meet an ongoing emergency," *Davis*, 547 U. S., at 822, Covington's identification and description of the shooter and the location of the shooting were not testimonial hearsay. The Confrontation Clause did not bar their admission at Bryant's trial.

\*    \*    \*

For the foregoing reasons, we hold that Covington's statements were not testimonial and that their admission

at Bryant's trial did not violate the Confrontation Clause. We leave for the Michigan courts to decide on remand whether the statements' admission was otherwise permitted by state hearsay rules. The judgment of the Supreme Court of Michigan is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

1

# SUPREME COURT OF THE UNITED STATES

No. 09–150

## MICHIGAN, PETITIONER *v.* RICHARD PERRY BRYANT

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MICHIGAN

[February 28, 2011]

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that the admission of Covington's out-of-court statements did not violate the Confrontation Clause, but I reach this conclusion because Covington's questioning by police lacked sufficient formality and solemnity for his statements to be considered "testimonial." See *Crawford* v. *Washington*, 541 U. S. 36, 68 (2004).

In determining whether Covington's statements to police implicate the Confrontation Clause, the Court evaluates the "'primary purpose'" of the interrogation. *Ante*, at 12. The majority's analysis—which relies on, *inter alia*, what the police knew when they arrived at the scene, the specific questions they asked, the particular information Covington conveyed, the weapon involved, and Covington's medical condition—illustrates the uncertainty that this test creates for law enforcement and the lower courts. *Ante*, at 25–31. I have criticized the primary-purpose test as "an exercise in fiction" that is "disconnected from history" and "yields no predictable results." *Davis* v. *Washington*, 547 U. S. 813, 839, 838 (2006) (opinion concurring in judgment in part and dissenting in part).

Rather than attempting to reconstruct the "primary purpose" of the participants, I would consider the extent to which the interrogation resembles those historical prac-

tices that the Confrontation Clause addressed.  See, *e.g.*, *id.*, at 835–836 (describing "practices that occurred under the English bail and committal statutes passed during the reign of Queen Mary").  As the majority notes, Covington interacted with the police under highly informal circumstances, while he bled from a fatal gunshot wound.  *Ante*, at 19–20, 31.  The police questioning was not "a formalized dialogue," did not result in "formalized testimonial materials" such as a deposition or affidavit, and bore no "indicia of solemnity."  *Davis*, *supra*, at 840, 837 (opinion of THOMAS, J.); see also *Giles* v. *California*, 554 U. S. 353, 377–378 (2008) (THOMAS, J., concurring).  Nor is there any indication that the statements were offered at trial "in order to evade confrontation."  *Davis*, *supra*, at 840.  This interrogation bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.  Covington thus did not "bea[r] testimony" against Bryant, *Crawford*, *supra*, at 51, and the introduction of his statements at trial did not implicate the Confrontation Clause.  I concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

No. 09–150

## MICHIGAN, PETITIONER *v.* RICHARD PERRY BRYANT

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF MICHIGAN

[February 28, 2011]

JUSTICE SCALIA, dissenting.

Today's tale—a story of five officers conducting successive examinations of a dying man with the primary purpose, not of obtaining and preserving his testimony regarding his killer, but of protecting him, them, and others from a murderer somewhere on the loose—is so transparently false that professing to believe it demeans this institution. But reaching a patently incorrect conclusion on the facts is a relatively benign judicial mischief; it affects, after all, only the case at hand. In its vain attempt to make the incredible plausible, however—or perhaps as an intended second goal—today's opinion distorts our Confrontation Clause jurisprudence and leaves it in a shambles. Instead of clarifying the law, the Court makes itself the obfuscator of last resort. Because I continue to adhere to the Confrontation Clause that the People adopted, as described in *Crawford* v. *Washington*, 541 U. S. 36 (2004), I dissent.

I
A

The Confrontation Clause of the Sixth Amendment, made binding on the States by the Fourteenth Amendment, *Pointer* v. *Texas*, 380 U. S. 400, 403 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy

the right . . . to be confronted with the witnesses against
him." In *Crawford*, we held that this provision guarantees
a defendant his common-law right to confront those "who
'bear testimony'" against him. 541 U. S., at 51. A witness
must deliver his testimony against the defendant in per-
son, or the prosecution must prove that the witness is
unavailable to appear at trial and that the defendant
has had a prior opportunity for cross-examination. *Id.,* at
53–54.

Not all hearsay falls within the Confrontation Clause's
grasp. At trial a witness "bears testimony" by providing
"'[a] solemn declaration or affirmation . . . for the purpose
of establishing or proving some fact.'" *Id.,* at 51 (quoting 2
N. Webster, An American Dictionary of the English Lan-
guage (1828)). The Confrontation Clause protects defen-
dants only from hearsay statements that do the same.
*Davis* v. *Washington*, 547 U. S. 813, 823–824 (2006). In
*Davis*, we explained how to identify testimonial hearsay
prompted by police questioning in the field. A statement
is testimonial "when the circumstances objectively indi-
cate . . . that the primary purpose of the interrogation is to
establish or prove past events potentially relevant to later
criminal prosecution." *Id.,* at 822. When, however, the
circumstances objectively indicate that the declarant's
statements were "a cry for help [o]r the provision of infor-
mation enabling officers immediately to end a threatening
situation," *id.,* at 832, they bear little resemblance to in-
court testimony. "No 'witness' goes into court to proclaim
an emergency and seek help." *Id.,* at 828.

*Crawford* and *Davis* did not address whose perspective
matters—the declarant's, the interrogator's, or both—
when assessing "the primary purpose of [an] interroga-
tion." In those cases the statements were testimonial from
any perspective. I think the same is true here, but be-
cause the Court picks a perspective so will I: The decla-
rant's intent is what counts. In-court testimony is more

than a narrative of past events; it is a solemn declaration made in the course of a criminal trial. For an out-of-court statement to qualify as testimonial, the declarant must intend the statement to be a solemn declaration rather than an unconsidered or offhand remark; and he must make the statement with the understanding that it may be used to invoke the coercive machinery of the State against the accused.[1] See Friedman, Grappling with the Meaning of "Testimonial," 71 Brooklyn L. Rev. 241, 259 (2005). That is what distinguishes a narrative told to a friend over dinner from a statement to the police. See *Crawford, supra,* at 51. The hidden purpose of an interrogator cannot substitute for the declarant's intentional solemnity or his understanding of how his words may be used.

A declarant-focused inquiry is also the only inquiry that would work in every fact pattern implicating the Confrontation Clause. The Clause applies to volunteered testimony as well as statements solicited through police interrogation. See *Davis, supra*, at 822–823, n. 1. An inquiry into an officer's purposes would make no sense when a declarant blurts out "Rick shot me" as soon as the officer arrives on the scene. I see no reason to adopt a different test—one that accounts for an officer's intent—when the officer asks "what happened" before the declarant makes his accusation. (This does not mean the interrogator is irrelevant. The identity of an interrogator, and the content and tenor of his questions, can bear upon whether a declarant intends to make a solemn statement, and envisions its use at a criminal trial. But none of this means that the interrogator's purpose matters.)

In an unsuccessful attempt to make its finding of emer-

---

[1] I remain agnostic about whether and when statements to nonstate actors are testimonial. See *Davis* v. *Washington,* 547 U. S. 813, 823, n. 2 (2006).

gency plausible, the Court instead adopts a test that looks to the purposes of both the police and the declarant. It claims that this is demanded by necessity, fretting that a domestic-violence victim may want her abuser briefly arrested—presumably to teach him a lesson—but not desire prosecution. See *ante,* at 22. I do not need to probe the purposes of the police to solve that problem. Even if a victim speaks to the police "to establish or prove past events" solely for the purpose of getting her abuser arrested, she surely knows her account is "potentially relevant to later criminal prosecution" should one ensue. *Davis*, *supra*, at 822.

The Court also wrings its hands over the possibility that "a severely injured victim" may lack the capacity to form a purpose, and instead answer questions "reflexive[ly]." *Ante*, at 22. How to assess whether a declarant with diminished capacity bore testimony is a difficult question, and one I do not need to answer today. But the Court's proposed answer—to substitute the intentions of the police for the missing intentions of the declarant—cannot be the correct one. When the declarant has diminished capacity, focusing on the interrogators make less sense, not more. The inquiry under *Crawford* turns in part on the actions and statements of a declarant's audience only because they shape the declarant's perception of why his audience is listening and therefore influence *his purpose* in making the declaration. See 541 U. S., at 51. But a person who cannot perceive his own purposes certainly cannot perceive why a listener might be interested in what he has to say. As far as I can tell, the Court's substituted-intent theory "has nothing to be said for it except that it can sometimes make our job easier," *Jerman* v. *Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A.*, 559 U. S. ___, ___ (2010) (SCALIA, J., concurring in part and concurring in judgment) (slip op., at 2).

The Court claims one affirmative virtue for its focus on

the purposes of both the declarant and the police: It "ame-liorates problems that . . . arise" when declarants have "mixed motives." *Ante*, at 21. I am at a loss to know how. Sorting out the primary purpose of a declarant with mixed motives is sometimes difficult. But adding in the mixed motives of the police only compounds the problem. Now courts will have to sort through two sets of mixed motives to determine the primary purpose of an interrogation. And the Court's solution creates a mixed-motive problem where (under the proper theory) it does not exist—viz., where the police and the declarant each have one motive, but those motives conflict. The Court does not provide an answer to this glaringly obvious problem, probably be-cause it does not have one.

The only virtue of the Court's approach (if it can be misnamed a virtue) is that it leaves judges free to reach the "fairest" result under the totality of the circumstances. If the dastardly police trick a declarant into giving an incriminating statement against a sympathetic defendant, a court can focus on the police's intent and declare the statement testimonial. If the defendant "deserves" to go to jail, then a court can focus on whatever perspective is necessary to declare damning hearsay nontestimonial. And when all else fails, a court can mix-and-match per-spectives to reach its desired outcome. Unfortunately, under this malleable approach "the guarantee of confron-tation is no guarantee at all." *Giles* v. *California*, 554 U. S. 353, 375 (2008) (plurality).

B

Looking to the declarant's purpose (as we should), this is an absurdly easy case. Roughly 25 minutes after Anthony Covington had been shot, Detroit police responded to a 911 call reporting that a gunshot victim had appeared at a neighborhood gas station. They quickly arrived at the scene, and in less than 10 minutes five different Detroit

police officers questioned Covington about the shooting. Each asked him a similar battery of questions: "what happened" and when, App. 39, 126, "who shot" the victim," *id.,* at 22, and "where" did the shooting take place, *id.,* at 132. See also *id.,* at 113. After Covington would answer, they would ask follow-up questions, such as "how tall is" the shooter, *id.,* at 134, "[h]ow much does he weigh," *ibid.* what is the exact address or physical description of the house where the shooting took place, and what chain of events led to the shooting. The battery relented when the paramedics arrived and began tending to Covington's wounds.

From Covington's perspective, his statements had little value except to ensure the arrest and eventual prosecution of Richard Bryant. He knew the "threatening situation," *Davis,* 547 U. S., at 832, had ended six blocks away and 25 minutes earlier when he fled from Bryant's back porch. See 483 Mich. 132, 135–136, 768 N.W. 2d 65, 67 (2009); App. 105. Bryant had not confronted him face-to-face before he was mortally wounded, instead shooting him through a door. See 483 Mich.*,* at 136–137, 768 N.W. 2d, at 67. Even if Bryant had pursued him (unlikely), and after seeing that Covington had ended up at the gas station was unable to confront him there before the police arrived (doubly unlikely), it was entirely beyond imagination that Bryant would again open fire while Covington was surrounded by five armed police officers. And Covington knew the shooting was the work of a drug dealer, not a spree killer who might randomly threaten others. *Id.,* at 135, 137, 768 N.W. 2d, at 67.

Covington's knowledge that he had nothing to fear differs significantly from Michelle McCottry's state of mind during her "frantic" statements to a 911 operator at issue in *Davis*, 547 U. S., at 827. Her "call was plainly a call for help against a bona fide physical threat" describing "events *as they were actually happening*." *Ibid.* She did

not have the luxuries of police protection and of time and space separating her from immediate danger that Covington enjoyed when he made his statements. See *id.,* at 831.

Covington's pressing medical needs do not suggest that he was responding to an emergency, but to the contrary reinforce the testimonial character of his statements. He understood the police were focused on investigating a past crime, not his medical needs. None of the officers asked Covington how he was doing, attempted more than superficially to assess the severity of his wounds, or attempted to administer first aid.[2] They instead primarily asked questions with little, if any, relevance to Covington's dire situation. Police, paramedics, and doctors do not need to know the address where a shooting took place, the name of the shooter, or the shooter's height and weight to provide proper medical care. Underscoring that Covington understood the officers' investigative role, he interrupted their interrogation to ask "when is EMS coming?" App. 57. When, in other words, would the focus shift to his medical needs rather than Bryant's crime?

Neither Covington's statements nor the colloquy between him and the officers would have been out of place at a trial; it would have been a routine direct examination. See *Davis*, 547 U. S., at 830. Like a witness, Covington recounted in detail how a past criminal event began and progressed, and like a prosecutor, the police elicited that account through structured questioning. Preventing the

_____

[2] Officer Stuglin's testimony does not undermine my assessment of the officers' behavior, although the Court suggests otherwise. See *ante*, at 28, n. 18. Officer Stuglin first testified that he "asked something like what happened or are you okay, something to that line." App., 131. When pressed on whether he asked "how are you doing?," he responded, "Well, basically . . . what's wrong." *Ibid.* Other officers were not so equivocal: They admitted they had no need to "ask him how he was doing. . . . It was very obvious how he was doing." *Id.*, at 110; see also *id.,* at 19.

admission of "weaker substitute[s] for live testimony at trial" such as this, *id.,* at 828 (internal quotation marks omitted), is precisely what motivated the Framers to adopt the Confrontation Clause and what motivated our decisions in *Crawford* and in *Hammon* v. *Indiana,* decided with *Davis.* *Ex parte* examinations raise the same constitutional concerns whether they take place in a gas-station parking lot or in a police interrogation room.

### C

Worse still for the repute of today's opinion, this is an absurdly easy case even if one (erroneously) takes the interrogating officers' purpose into account. The five officers interrogated Covington primarily to investigate past criminal events. None—absolutely none—of their actions indicated that they perceived an imminent threat. They did not draw their weapons, and indeed did not immediately search the gas station for potential shooters.[3] To the contrary, all five testified that they questioned Covington *before conducting any investigation at the scene.* Would this have made any sense if they feared the presence of a shooter? Most tellingly, none of the officers started his interrogation by asking what would have been the obvious first question if any hint of such a fear existed: Where is the shooter?

But do not rely solely on my word about the officers' primary purpose. Listen to Sergeant Wenturine, who candidly admitted that he interrogated Covington because he "ha[d] a man here that [he] believe[d] [was] dying [so

---

[3] The Court cites Officer Stuglin's testimony that "I think [Brown and Pellerito] did a little bit of both" joining the interrogation and helping to secure the scene. *Id.*, at 135–136. But the point is not whether they did both; it is whether they moved to secure the area *first.* No officer's testimony suggests this. Pellerito testified that he, Stuglin, and Brown arrived at the scene at roughly the same time and all three immediately went to Covington. See *id.,* at 17–18. The testimony of Brown and McCallister corroborate that account. See *id.,* at 34–36, 79–82.

he was] gonna find out who did this, period." App. 112. In short, he needed to interrogate Covington to solve a crime. Wenturine never mentioned an interest in ending an ongoing emergency.

At the very least, the officers' intentions *turned* investigative during their 10-minute encounter with Covington, and the conversation "evolve[d] into testimonial statements." *Davis*, 547 U. S., at 828 (internal quotation marks omitted). The fifth officer to arrive at the scene did not need to run straight to Covington and ask a battery of questions "to determine the need for emergency assistance," *Ibid.* He could have asked his fellow officers, who presumably had a better sense of that than Covington— and a better sense of what he could do to assist. No, the value of asking the same battery of questions a fifth time was to ensure that Covington told a consistent story and to see if any new details helpful to the investigation and eventual prosecution would emerge. Having the testimony of five officers to recount Covington's consistent story undoubtedly helped obtain Bryant's conviction. (Which came, I may note, after the first jury could not reach a verdict. See 483 Mich., at 137, 768 N.W. 2d, at 67.)

D

A final word about the Court's active imagination. The Court invents a world where an ongoing emergency exists whenever "an armed shooter, whose motive for and location after the shooting [are] unknown, . . . mortally wound[s]" one individual "within a few blocks and [25] minutes of the location where the police" ultimately find that victim. *Ante*, at 27. Breathlessly, it worries that a shooter could leave the scene armed and ready to pull the trigger again. See *ante*, at 17–18, 27, 30. Nothing suggests the five officers in this case shared the Court's

dystopian[4] view of Detroit, where drug dealers hunt their shooting victim down and fire into a crowd of police officers to finish him off, see *ante*, at 30, or where spree killers shoot through a door and then roam the streets leaving a trail of bodies behind. Because almost 90 percent of murders involve a single victim,[5] it is much more likely—indeed, I think it certain—that the officers viewed their encounter with Covington for what it was: an investigation into a past crime with no ongoing or immediate consequences.

The Court's distorted view creates an expansive exception to the Confrontation Clause for violent crimes. Because Bryant posed a continuing threat to public safety in the Court's imagination, the emergency persisted for confrontation purposes at least until the police learned his "motive for and location after the shooting." *Ante*, at 27. It may have persisted in this case until the police "secured the scene of the shooting" two-and-a-half hours later. *Ante*, at 28. (The relevance of securing the scene is unclear so long as the killer is still at large—especially if, as the Court speculates, he may be a spree-killer.) This is a dangerous definition of emergency. Many individuals who testify against a defendant at trial first offer their accounts to police in the hours after a violent act. If the police can plausibly claim that a "potential threat to . . . the public" persisted through those first few hours, *ante*, at 12 (and if the claim is plausible here it is always plau-

_____

[4] The opposite of utopian. The word was coined by John Stuart Mill as a caustic description of British policy. See 190 Hansard's Parliamentary Debates, Third Series 1517 (3d Ser. 1868); 5 Oxford English Dictionary 13 (2d ed. 1989).

[5] See Federal Bureau of Investigation, Crime in the United States, 2009: Expanded Homicide Data Table 4, Murder by Victim/Offender Situations, 2009 (Sept. 2010), online at http://www2.fbi.gov/ucr/cius2009/offenses/expanded_information/data/shrtable_04.html (as visited Feb. 25, 2011, and available in Clerk of Court's case file).

sible) a defendant will have no constitutionally protected right to exclude the uncross-examined testimony of such witnesses. His conviction could rest (as perhaps it did here) solely on the officers' recollection at trial of the witnesses' accusations.

The Framers could not have envisioned such a hollow constitutional guarantee. No framing-era confrontation case that I know of, neither here nor in England, took such an enfeebled view of the right to confrontation. For example, *King* v. *Brasier*, 1 Leach 199, 200, 168 Eng. Rep. 202, 202–203 (K. B. 1779), held inadmissible a mother's account of her young daughter's statements "immediately on her coming home" after being sexually assaulted. The daughter needed to testify herself. But today's majority presumably would hold the daughter's account to her mother a nontestimonial statement made during an ongoing emergency. She could not have known whether her attacker might reappear to attack again or attempt to silence the lone witness against him. Her mother likely listened to the account to assess the threat to her own safety and to decide whether the rapist posed a threat to the community that required the immediate intervention of the local authorities. Cf. *ante*, at 29–30. Utter nonsense.

The 16th- and 17th-century English treason trials that helped inspire the Confrontation Clause show that today's decision is a mistake. The Court's expansive definition of an "ongoing emergency" and its willingness to consider the perspective of the interrogator and the declarant cast a more favorable light on those trials than history or our past decisions suggest they deserve. Royal officials conducted many of the *ex parte* examinations introduced against Sir Walter Raleigh and Sir John Fenwick while investigating alleged treasonous conspiracies of unknown scope, aimed at killing or overthrowing the King. See Brief for National Association of Criminal Defense Law-

yers as *Amicus Curiae* 21–22, and n. 11. Social stability in 16th- and 17th-century England depended mainly on the continuity of the ruling monarch, cf. 1 J. Stephen, A History of the Criminal Law of England 354 (1883), so such a conspiracy posed the most pressing emergency imaginable. Presumably, the royal officials investigating it would have understood the gravity of the situation and would have focused their interrogations primarily on ending the threat, not on generating testimony for trial. I therefore doubt that under the Court's test English officials acted improperly by denying Raleigh and Fenwick the opportunity to confront their accusers "face to face," *id.,* at 326.

Under my approach, in contrast, those English trials remain unquestionably infamous. Lord Cobham did not speak with royal officials to end an ongoing emergency. He was a traitor! He spoke, as Raleigh correctly observed, to establish Raleigh's guilt and to save his own life. See 1 D. Jardine, Criminal Trials 435 (1832). Cobham's statements, when assessed from his perspective, had only a testimonial purpose. The same is true of Covington's statements here.

## II
## A

But today's decision is not only a gross distortion of the facts. It is a gross distortion of the law—a revisionist narrative in which reliability continues to guide our Confrontation Clause jurisprudence, at least where emergencies and faux emergencies are concerned.

According to today's opinion, the *Davis* inquiry into whether a declarant spoke to end an ongoing emergency or rather to "prove past events potentially relevant to later criminal prosecution," 547 U. S., at 822, is *not* aimed at answering whether the declarant acted as a witness. Instead, the *Davis* inquiry probes the *reliability* of a declarant's statements, "[i]mplicit[ly]" importing the excited-

utterances hearsay exception into the Constitution. *Ante*, at 14–15. A statement during an ongoing emergency is sufficiently reliable, the Court says, "because the prospect of fabrication . . . is presumably significantly diminished," so it "does not [need] to be subject to the crucible of cross-examination." *Id.,* at 14.

Compare that with the holding of *Crawford:* "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 541 U. S., at 68–69. Today's opinion adopts, for emergencies and faux emergencies at least, the discredited logic of *White* v. *Illinois*, 502 U. S. 346, 355–356, and n. 8 (1992), and *Idaho* v. *Wright*, 497 U. S. 805, 819–820 (1990). *White* is, of course, the decision that both *Crawford* and *Davis* found most incompatible with the text and history of the Confrontation Clause. See *Davis*, *supra*, at 825; *Crawford*, *supra*, at 58, n. 8. (This is not to say that that "reliability" logic can actually justify today's result: Twenty-five minutes is plenty of time for a shooting victim to reflect and fabricate a false story.)

The Court announces that in future cases it will look to "standard rules of hearsay, designed to identify some statements as reliable," when deciding whether a statement is testimonial. *Ante*, at 11–12. *Ohio* v. *Roberts*, 448 U. S. 56 (1980) said something remarkably similar: An out-of-court statement is admissible if it "falls within a firmly rooted hearsay exception" or otherwise "bears adequate 'indicia of reliability.'" *Id.*, at 66. We tried that approach to the Confrontation Clause for nearly 25 years before *Crawford rejected* it as an unworkable standard unmoored from the text and the historical roots of the Confrontation Clause. See 541 U. S., at 54, 60, 63–65, 67–68. The arguments in Raleigh's infamous 17th-century treason trial contained full debate about the reliability of Lord Cobham's *ex parte* accusations, see *Raleigh's Case*,

2 How. St. Tr. 1, 14, 17, 19–20, 22–23, 29 (1603); that case remains the canonical example of a Confrontation Clause violation, not because Raleigh should have won the debate but because he should have been allowed cross-examination.

The Court attempts to fit its resurrected interest in reliability into the *Crawford* framework, but the result is incoherent. Reliability, the Court tells us, is a good indicator of whether "a statement is . . . an out-of-court substitute for trial testimony." *Ante*, at 11. That is patently false. Reliability tells us *nothing* about whether a statement is testimonial. Testimonial and nontestimonial statements alike come in varying degrees of reliability. An eyewitness's statements to the police after a fender-bender, for example, are both reliable and testimonial. Statements to the police from one driver attempting to blame the other would be similarly testimonial but rarely reliable.

The Court suggests otherwise because it "misunderstands the relationship" between qualification for one of the standard hearsay exceptions and exemption from the confrontation requirement. *Melendez-Diaz* v. *Massachusetts*, 557 U. S. ___, ___ (2009) (slip op., at 18). That relationship is not a causal one. Hearsay law exempts business records, for example, because businesses have a financial incentive to keep reliable records. See Fed. Rule Evid. 803(6). The Sixth Amendment also generally admits business records into evidence, but not because the records are reliable or because hearsay law says so. It admits them "because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not" weaker substitutes for live testimony. *Melendez-Diaz*, 557 U. S., at ___ (slip op., at 18). Moreover, the scope of the exemption from confrontation and that of the hearsay exceptions also are not always coextensive. The reliability logic of the

business-record exception would extend to records maintained by neutral parties providing litigation-support services, such as evidence testing. The Confrontation Clause is not so forgiving. Business records prepared specifically for use at a criminal trial are testimonial and require confrontation. See *ibid.*

Is it possible that the Court does not recognize the contradiction between its focus on reliable statements and *Crawford*'s focus on testimonial ones? Does it not realize that the two cannot coexist? Or does it intend, by following today's illogical roadmap, to resurrect *Roberts* by a thousand unprincipled distinctions without ever explicitly overruling *Crawford?* After all, honestly overruling *Crawford* would destroy the illusion of judicial minimalism and restraint. And it would force the Court to explain how the Justices' preference comports with the meaning of the Confrontation Clause that the People adopted—or to confess that only the Justices' preference really matters.

## B

The Court recedes from *Crawford* in a second significant way. It requires judges to conduct "open-ended balancing tests" and "amorphous, if not entirely subjective," inquiries into the totality of the circumstances bearing upon reliability. 541 U. S., at 63, 68. Where the prosecution cries "emergency," the admissibility of a statement now turns on "a highly context-dependent inquiry," *ante*, at 16, into the type of weapon the defendant wielded, see *ante*, at 17*;* the type of crime the defendant committed, see *ante*, at 12, 16–17; the medical condition of the declarant, see *ante*, at 17–18; if the declarant is injured, whether paramedics have arrived on the scene, see *ante*, at 20; whether the encounter takes place in an "exposed public area," *ibid.*; whether the encounter appears disorganized, see *ibid.*; whether the declarant is capable of forming a purpose, see *ante*, at 22; whether the police have secured the scene of

the crime, see *ante*, at 28; the formality of the statement, see *ante*, at 19; and finally, whether the statement strikes us as reliable, see *ante*, at 11–12, 14–15. This is no better than the nine-factor balancing test we rejected in *Crawford*, 541 U. S., at 63. I do not look forward to resolving conflicts in the future over whether knives and poison are more like guns or fists for Confrontation Clause purposes, or whether rape and armed robbery are more like murder or domestic violence.

It can be said, of course, that under *Crawford* analysis of whether a statement is testimonial requires consideration of all the circumstances, and so is also something of a multifactor balancing test. But the "reliability" test does not replace that analysis; it supplements it. As I understand the Court's opinion, even when it is determined that no emergency exists (or perhaps before that determination is made) the statement would be found admissible as far as the Confrontation Clause is concerned if it is not testimonial.

In any case, we did not disavow multifactor balancing for reliability in *Crawford* out of a preference for rules over standards. We did so because it "d[id] violence to" the Framers' design. *Id.,* at 68. It was judges' open-ended determination of what was reliable that violated the trial rights of Englishmen in the political trials of the 16th and 17th centuries. See, *e.g., Throckmorton's Case*, 1 How. St. Tr. 869, 875–876 (1554); *Raleigh's Case*, 2 How. St. Tr., at 15–16, 24. The Framers placed the Confrontation Clause in the Bill of Rights to ensure that those abuses (and the abuses by the Admiralty courts in colonial America) would not be repeated in this country. Not even the least dangerous branch can be trusted to assess the reliability of uncross-examined testimony in politically charged trials or trials implicating threats to national security. See *Crawford, supra*, at 67–68; cf. *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 576–578 (2004) (SCALIA, J., dissenting).

\*    \*    \*

Judicial decisions, like the Constitution itself, are nothing more than "parchment barriers," 5 Writings of James Madison 269, 272 (G. Hunt ed. 1901). Both depend on a judicial culture that understands its constitutionally assigned role, has the courage to persist in that role when it means announcing unpopular decisions, and has the modesty to persist when it produces results that go against the judges' policy preferences. Today's opinion falls far short of living up to that obligation—short on the facts, and short on the law.

For all I know, Bryant has received his just deserts. But he surely has not received them pursuant to the procedures that our Constitution requires. And what has been taken away from him has been taken away from us all.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–150

_____

## MICHIGAN, PETITIONER *v.* RICHARD PERRY BRYANT

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MICHIGAN

[February 28, 2011]

JUSTICE GINSBURG, dissenting.

I agree with JUSTICE SCALIA that Covington's statements were testimonial and that "[t]he declarant's intent is what counts." *Ante*, at 2 (dissenting opinion). Even if the interrogators' intent were what counts, I further agree, Covington's statements would still be testimonial. *Ante*, at 8. It is most likely that "the officers viewed their encounter with Covington [as] an investigation into a past crime with no ongoing or immediate consequences." *Ante*, at 10. Today's decision, JUSTICE SCALIA rightly notes, "creates an expansive exception to the Confrontation Clause for violent crimes." *Ibid.* In so doing, the decision confounds our recent Confrontation Clause jurisprudence, *ante*, at 12, which made it plain that "[r]eliability tells us nothing about whether a statement is testimonial," *ante*, at 14 (emphasis deleted).

I would add, however, this observation. In *Crawford* v. *Washington*, 541 U. S. 36, 56, n. 6 (2004), this Court noted that, in the law we inherited from England, there was a well-established exception to the confrontation requirement: The cloak protecting the accused against admission of out-of-court testimonial statements was removed for dying declarations. This historic exception, we recalled in *Giles* v. *California*, 554 U. S. 353, 358 (2008); see *id.*, at 361–362, 368, applied to statements made by a person

about to die and aware that death was imminent. Were the issue properly tendered here, I would take up the question whether the exception for dying declarations survives our recent Confrontation Clause decisions. The Michigan Supreme Court, however, held, as a matter of state law, that the prosecutor had abandoned the issue. See 483 Mich. 132, 156–157, 768 N. W. 2d 65, 78 (2009). The matter, therefore, is not one the Court can address in this case.