WIGGINS, Justice
(dissenting).
I dissent." I disagree with the majority opinion’s analysis concerning' the significance of A.W.’s age in determining whether the introduction of her statements violated J.C.’s rights under the Cónfi’ontation Clause contained in the Sixth Amendment to the United States Constitution. Additionally, I disagree with the conclusion reached in the majority opinion and the special concurrence as to the primary purpose of A,W.’s statements. Because the *461 primary-purpose test requires' a court to consider the purposes of all participants involved in eliciting a statement as part of the totality of the circumstances, it is evident that A.W.’s statements were testimonial.
Ohio v. Clark is the only case in which the United States Supreme Court has addressed whether statements a victim made to someone other than a law enforcement officer may violate the Confrontation Clause. 576 U.S. —, —, 135 S.Ct. 2173, 2180, 192 L.Ed.2d 306, 314-15 (2015). In Clark, the Court recognized “at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns.” Id. at —, 135 S.Ct. at 2181, 192 LEd.2d at 315. The Court also affirmed that determinations as to whether such statements are testimonial turn on the primary-purpose test. Id.
■ The primary-purpose test requires a court to determine “whether, in light of all the circumstances, viewed objectively, the ‘primary purpose’ of the conversation was to ‘ereat[e] an out-of-court substitute for trial testimony.’ ” Id. at —, 135 S.Ct. at 2180, 192 L.Ed.2d at 315 (quoting Michigan v. Bryant, 562 U.S. 344, 358, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93, 107 (2011)). As the Court has previously explained,
[T]he relevant inquiry- is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals’ statements and actions and the circumstances in which the encounter occurred.
Bryant, 562 U.S. at 360, 131 S.Ct. at 1156, 179 L.Ed.2d at 108-09.
The'primary-purpose determination demands objective analysis of the circumstances of the encounter and the statements and actions of both interviewer and interviewee. See id. at 360, 131 S.Ct. at 1156, 179 L.Ed.2d at 108. In other words, a court must look to the totality of the circumstances and consider the purposes of all participants involved in obtaining a statement when deciding whether a statement’s primary purpose was testimonial.
The Clark Court made two additional observations concerning application of the primary-purpose test. First, statements made to persons who are “not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers.” Clark, 576 U.S. at —, 135 S.Ct. at 2182, 192 L.Ed.2d at 317. Second, a very young child who is being abused is “extremely unlikely . .■. [to] intend his statements to be a substitute for trial testimony.” Id. at —, 135 S.Ct. at 2182, 192 L.Ed.2d at 316.
I agree with most of the majority opinion’s analysis of Clark. However, the majority opinion essentially reads Clark as holding statements by very young children never implicate the Confrontation Clause, unless (perhaps) such statements were made to or in the presence of a law enforcement officer.[8] The Clark Court stopped far short of adopting such a rule. The age of the three-year-old child, L.P., who made the statements at'issue in Clark merely “fortified” the Court’s conclusion that the statements he made were nontes-timonial insofar as his youth made it “extremely unlikely” he intended those statements to serve as a substitute for trial *462 testimony. Id. at —, 135 S.Ct. at 2181—82, 192 L.Ed.2d at 316. Although the Court acknowledged it was doubtful statements a three-year-old child made to his teachers would have been understood to raise confrontation concerns at the time of the founding, the Court concluded the statements at issue were nontestimonial by relying on the primary-purpose test. Id. at —, 135 S.Ct. at 2181-82, 192 L.Ed.2d at 315-16; see id. at —, 135 S.Ct. at 2184-85, 192 L.Ed.2d at 319-20 (Scalia, J., concurring in the judgment) (discussing the majority holding and pointing opt that the burden is upon the prosecutor who seeks to introduce testimonial evidence despite the Confrontation Clause “to prove a long-established practice of introducing specific kinds of evidence, such as dying declarations, for which cross-examination was not typically necessary” (citation omitted)).
The Clark Court acknowledged the existence of “strong evidence that' statements made in circumstances similar to those facing L.P. and his teachers were admissible at common law” and indicated it is “thus highly doubtful that statements like L.P.’s ever would have been understood to raise Confrontation Clause concerns.” Id. at —, 135 S.Ct. at 2182, 192 L.Ed.2d at 316-17 (majority opinion) (emphasis added). However, the Court in no way suggested historical evidence was critical to its holding, let alone adopted a categorical rule that statements made by very, young children do not raise confrontation concerns.
For this reason, most legal scholars to consider Clark thus'far have recognized as dictum the language in Clark suggesting ■the fact that an out-of-court statement’s primary purpose was testimonial as “necessary, but not always sufficient” for' its exclusion under .the Confrontation Clause. See Richard D. Friedman, Ohio v. Clark.Some Initial Thoughts, The Confrontation Blog (June 19, 2015, 1:09 AM), http://confr ontationright.blogspot.eom/2015/06/ohio-v-clark-some-initial-thoughts.html (acknowledging the “necessary but not always sufficient” language as “potentially dangerous” dictum); Paul F. Rothstein, A Comment on the Supreme Court’s Decision in Ohio v. Clark: The Court’s Confrontation Clause Jurisprudence Evolves (2015), http://ssrn.com/abstract=2627748 (noting Clark provides an “escape hatch for future cases — one that is clearly dictum”); see also Chad Squitieri, Note, Confronting Big Data: Applying the Confrontation Clause to Government Data Collection, 101 Ya. L. Rev. 2011, 2022 n. 71 (2015) (describing the “necessary, but not always sufficient” language as dictum). Justice Scalia, joined by Justice Ginsburg in an opinion concurring in the result, agreed. Clark, 576 U.S. at —, 135 S.Ct. at 2184-85, 192 L.Ed.2d at 318-20 (Scalia, J., concurring in the judgment).
In my view, the majority opinion rests on an expansive reading of dictum in Clark to adopt the very rule the Clark majority refused to adopt. Simply put, the Clark majority declined to hold that statements made by very young children or statements made to individuals other than law enforcement officers never implicate the Confrontation Clause. Rather, as the Clark majority explained, “Courts must evaluate challenged statements in context, and part of that context is the questioner’s identity.” Id. at —, 135 S.Ct. at 2182, 192 L.Ed.2d at 317 (majority opinion).
Of course, the analysis in Clark concerning whether the statements at issue in that case were testimonial is instructive. Because the three-year-old child who made those statements was so young, in applying the primary-purpose test the Court focused on the objective circumstances indicating the purpose his teachers had in *463 eliciting them. Id. at —, 135 S.Ct. at 2181, 192 L.Ed.2,d at 315-16. The Court concluded the statements were nontesti-monial because his teachers were responding to an “ongoing emergency involving suspected child abuse” and sought to “protect the victim from future attacks.” Id. In short, there was simply “no indication that the primary purpose of the conversation was to gather evidence for Clark’s prosecution” given that the conversation between the child and his. teachers was “informal and spontaneous.” Id. at —, 135 S.Ct. at 2181, 192 L.Ed.2d at 316.
In applying the primary-purpose test,' it is important to consider objectively all the circumstances surrounding the statements at issue, not just those suggesting the statements were nontestimonial. Here, two objective circumstances weigh in favor of the conclusion that A.W.’s statements were nontestimonial. First, Dr. Harre is not a police officer. Second, A.W. was only four-and-a-half-years old when she made the statements to Dr. Harre.
On the other side of the scale are several circumstances suggesting “in light of all the circumstances, viewed objectively, the ‘primary purpose! .of the conversation was to ‘creat[e] an out-of-court substitute for trial testimony.’ ” Id. at —, 135 S.Ct. at 2180, 192 L.Ed.2d at 315 (quoting Bryant, 562 U.S. at 358, 131. S.Ct. at 1155, 179 L.Ed.2d at 107). In. contrast to. Clark, there was ample circumstantial evidence to suggest the purpose of the individuals who elicited, the statement at issue was,to create an out-of-court substitute for tijial testimony and virtually no evidence to suggest they had. any other purpqse.
First, it -is clear law enforcement instructed A.W.’s parents to take her to Dr. Harre’s office. Detective Robinson testified as follows:
Q. When did yo.u first become involved with the [J.C.] case? A. I don’t remember the exact date, but it was assigned to me at a certain time. That’s, when and how I became involved in it.
Q, Do you know if the family of [the victim] made initial contact with you or did they make initial contact with another officer? A. They made initial contact with the front desk of our police department and filed a report there.
Q. And when was it assigned to you? Al I do not know off the top of my head.
Q. But would .it have been shortly after they made contact? A. Yes. Yes, within a couple days.
Q. And what!s sort of the standard procedure for investigating this type of case? A. Usually, after I receive, the initial case, I’ll read the report and find out who I have involved in that-investigation, and we’ll call- each one in as a witness.
With this particular ease having a vic- ' tim, especially a young victim, I got ahold of her mother and father and had them take her down to the Child Protection Center where Dr. Harre’s office is to be examined by her, and also specifically interviewed by ’ Michele Mattox, who is a child forensic interviewer through that same department as well.
Q. And did you interview the other children involved in this situation? A. I did.
Thus, Detective Robinson testified he sought to have Dr. Harre’s office perform the investigative task of interviewing A.W. because she was so youngs . In contrast, Detective Robinson interviewed the older children present at the time of the alleged delinquent act himself. Moreover, as his testimony makes clear, Detective Robinson instructed A.W.’s parents to take her to Dr. Harre because doing, so was part of the Davenport Police Department’s “stan *464 dard operating procedure for investigating this type of case.”
The fact that the Davenport Police Department regularly utilizes Dr. Harre’s office to interview young children who are suspected victims of abuse suggests Dr. Harre’s office acts on behalf of the police in conducting such interviews. The Code actively encourages the police and others involved in prosecuting suspected child abuse to work cooperatively with medical and mental health professionals such as Dr. Harre to conduct child abuse investigations and make child abuse asséssments. The Code provides,
4- a. A child protection assistance team involving the county attorney, law enforcement personnel, and personnel of the department of human services shall be established for each county by the county attorney. However, by mutual agreement, two or more county attorneys may establish a single child protection, assistance team to coyer a multicounty area. , A child protection assistance team, to the greatest extent possible, may be consulted in,cases in-yplving a forcible felony against a child who is less than age fourteen in which the suspected.offender is,the person responsible .for the care of a child, as defined in section 232.68. A child protection assistance team may also be utilized in cases involving a violation of chapter 709 or 726 or other crime committed upon a victim as defined in sub- . section 1. ,
b. A child protection assistance team may also- consult with or include juvenile court officers, medical and mental health professionals, physicians or other hospital-based health professionals, court-appointed special advocates, guardians-ad litem, and members- of a multidisciplinary team created by the department óf human services for child abuse investigations. A child protection assistance team may work cooperatively with the early childhood Iowa area board established under chapter 2561. The child protection assistance team shall work with the department of human services in accordance with section 232.71B, subsection 3, in developing the protocols for prioritizing the actions taken in response to child abuse assessments and for law enforcement agencies working jointly with the department at the local level in processes for child abuse assessments. The department of justice may provide training and other assistance to support the activities of a child protection assistance team.
Iowa Code § 915.35(4)(a )-{b) (2015).
Second, the evidence confirms the forensic ■ interviewer also referred A.W. to Dr. Harre’s office. As the majority points out, Dr. Harre testified that A.W. was referred to her by the emergency room that saw A.W. on July 3, 2013. However, Dr. Harre stated in her report that A.W. was referred to the center by the emergency room. Dr. Harre indicated in the second sentence of her report that A.W. was referred to her office by- the forensic interviewer. ■ Moreover, as the majority opinion acknowledges, the forensic interviewer only got involved in the investigation after the police “made a referral call.”
The further significance of the fact that the forensic interviewer also referred A.W. to Dr. Harre lies in Dr. Harre’s recognition that the forensic interviewer’s primary concern is investigative, not diagnostic or therapeutic: Dr.' Harre testified as follows concerning the role of the forensic interviewer in child abuse investigations:'
Q. And is the forensic interview helpful in pursuing a diagnosis and treatment for the child? A; It’s helpful ' in the investigative aspect. ' Michele does — if she does recognize that there *465 are concerns that would benefit from a medical assessment, she will indicate that she definitively thinks that a medical assessment should be included in the process to the investigative team and to the family.
If the purpose of referring a child for a medical assessment is purely diagnostic or therapeutic, there would be no need for the forensic interviewer to alert “the investigative team” of anything.
Third, the. timing of the conversation between Dr. Harre and A.W. and the information available to Dr. Harre before that conversation took place suggests her primary concern was not diagnostic or therapeutic. If the purpose of Dr. Harre’s conversation with A.W. was diagnostic or therapeutic, common sense suggests Dr. Harre would have sought, or the forensic interviewer would have provided, a copy of the forensic interviewer’s report or a copy of the recorded interview before Dr. Harre met with A.W. Yet Dr. Harre testified she hád no knowledge of the statements A.W. made to the forensic interviewer prior to speaking with A.W.:
Q. What information were you provided — let me rephrase that. Were you provided a Copy or information regarding Michele Mattox’s interview of the child prior to your interview? A. No.
Q. So you weren’t familiar at the time of the interview with any of the statements that were made by [A.W.] to Michele Mattox? A. Correct.
The fact that Dr. Harre remained unfamiliar with the content of the forensic interview is particularly conspicuous in light of the surrounding circumstances. Dr. Harre and the forensic interviewer both work at the Child Protection Response Center. Thus, when Dr. Harre examined A.W., she had available to her a complete account of what happened to A.W. in her own words prepared by someone who worked in the very same office. The forensic interviewer recorded her interview with A.W. on July 10. Dr. Harre met with A.W. on July 81, three weeks after the forensic interviewer conducted the interview. and forwarded her notes to law enforcement. •
Similarly, the delay that occurred between the alleged delinquent act on July 2 and the conversation between Dr. Harre and A.W. suggests the purpose of that conversation was not diagnostic or therapeutic. If Dr. Harre’s purpose had been to assess whether A.W. required medical or mental health treatment due to the alleged delinquent act, it seems unlikely that Dr. Harre would have assessed A.W. on July 31, nearly a full month after J.C. allegedly committed the delinquent act.
Fourth, Dr. Harre sent her report to the county attorney’s office. This fact weighs significantly in favor of concluding the statements at issue were testimonial because it confirms that Dr. Harre understood herself to be cooperating with law enforcement in the investigation of the allegations against J.C. In fact, Dr. Harre not only sent the report to the office charged with prosecuting the alleged delinquent act, she also addressed it to the very individual responsible for prosecuting J.C. This fact belies any claina that Dr. Harre did not have a primary purpose of assisting law enforcement in prosecuting J.C.
Finally, the circumstances existing when the conversation between Dr. Harre and A.W. occurred are unlike those the Supreme Court relied upon to conclude the statements in Clark were nontestimonial. Notably, Dr. Harre interviewed and examined A.W. long after the police department had opened’ an investigation into the alleged delinquent act. In Clark, the victim made statements to his teachers prior to the initiation of any investigation. 576 *466 U.S. at —, 135 S.Ct. at 2178, 192 L.Ed.2d at 312.
Furthermore, because Dr. Harre and A.W. spoke nearly a month after the alleged delinquent act occurred, the statements A.W. made during that conversation were neither made nor elicited “in the context of an ongoing emergency”.in which “the immediate concern was to protect a vulnerable child” from the threat of future abuse. Id, at —, 135 S.Ct. at 2181, 192 L.Ed.2d at 315-16. There is no evidence to suggest Dr. Harre’s questions “were primarily aimed at identifying and ending the threat” to A.W. in order to protect her from immediate harm. Id. at —, 135 S.Ct. at 2181, 192 L.Ed.2d at 316.
Additionally, the conversation between Dr. Harre and A.W. was far from spontaneous or informal. Cf id. A.W. made the statements at issue in response to question's posed to her by an unfamiliar person in an unfamiliar setting. Dr. Harre is not a teacher or primary care physician who had a preexisting relationship with A.W. Dr. Harre’s office is not a preschool classroom where A.W. was accustomed to spending time. Though the conversation with Dr. Harre was unlike a formal interrogation in that a law enforcement officer was not present, it was not entirely informal. For example, Dr. Harre discussed the concept of truthfulness with A.W. near the start of their conversation.
As the majority opinion points out, A.W. was very young when she made the statements at issue in this case, and she made them outside the presence of the police or the prosecutors charged with prosecuting the case. I also agree with the majority opinion’s conclusion A.W. certainly did not make the statements with the intent that they be used to prosecute- J.C. However, nothing in Clark suggests these facts are adequate to decide this case. On the contrary, Clark acknowledges the primary-purpose test is a necessary component of the analysis when a defendant raises a confrontation challenge to determine whether the statement at issue was testimonial or not. Id. at —, 135 S.Ct. at 2180-81, 192 L.Ed.2d at 315.
In contrast to Clark, the facts of this case suggest the primary purpose of the conversation between Dr. Harre and AM. was to obtain statements from A.W. that the county attorney could introduce in court. The primary purpose of Dr. Harre’s conversation with A.W. was to gather evidence to be supplied to the very individual tasked with prosecuting J.C. The evidence indicates Dr. Harre understood herself to be cooperating with law enforcement in their investigative efforts. Law enforcement regularly relied upon her office as a tool in those efforts as part of its standard operating procedure. Had the police department anticipated the information Dr. Harre obtained would not be made available for use in its investigation, surely at least one of the officers within the department would have interviewed A.W. Though A.W. does not speak clearly, she was able to communicate effectively to Dr. Harre and the forensic investigator. There is no reason to believe she would have been unable to communicate during an interview with a police officer, or before the court in a juvenile proceeding, if appropriate safeguards were in place.
Accordingly, because the totality of the circumstances indicate the conversation during which A.W. made the statements contained in Dr. Harre’s report and testimony was intended to generate a substitute for trial testimony, I conclude those statements were testimonial. Police officers cannot enlist.third parties to act on their behalf in order to gather statements to be used, in court and later claim the statements were nontestimonial.
*467 For the same reason, I conclude the statements contained in Michelle Mattox’s report, and testimony were testimonial. As the majority opinion acknowledges, Mattox conducted a forensic interview of A.W. after police “made a referral call, and law enforcement was present when it occurred.” Additionally, Mattox' récorded the interview and provided a copy of the recording to the county attorneys office. Mattox also sent a copy of the report she generated after the interview to both the assistant county attorney in charge of prosecuting J.C. and the detective assigned to investigate him. In short, the evidence indicates, Mattox intentionally played an investigative role in the law enforcement investigation into the alleged delinquent act. '
For tliese reasons, I would reverse the finding of delinquency and remand the case for a new hearing.
HECHT and APPEL, JJ., join this dissent.

. When no single rationale explaining the result enjoys the assent of a majority of the Justices sitting, the holding of a fragmented court is the position taken by the Justices who concurred in the decision on the narrowest grounds. Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977).