RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0172p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 16-4039

MATTHEW J. KING,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:15-cr-00381-1—Donald C. Nugent, District Judge.

Decided and Filed:  August 4, 2017

Before:  SILER, SUTTON, and WHITE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**   Claire C. Curtis, FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant.  Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge.   A sting operation blends fiction with non-fiction.  The undercover officer feigns an offer to commit a crime and the individual accepts the offer, converting an offer to commit a crime based on untruths into a crime based on a true desire to violate the law.  Sometimes, as it happens, the resulting crime blends non-fiction with fiction.  In this instance, Matthew King, a lawyer, agreed to commit a real crime (by laundering the

supposed proceeds of non-existent drug sales) and offered to do so on the basis of a money-laundering technique observed on a fictional T.V. show (by imitating Saul Goodman, a lawyer character on *Breaking Bad*, who set up a sham corporation to launder drug proceeds).

This did not end well. A jury convicted King of two counts of money laundering and one count of attempted money laundering. King appeals his convictions on two grounds: (1) that the introduction of recorded conversations between him and the informant violated his Sixth Amendment right to confront the witnesses against him, and (2) that the district court improperly allowed the prosecution to ask him about his prior arrest for cocaine possession. We affirm.

I.

In early 2014, Matthew King approached Marcus Terry at a strip club. He had heard that Terry was a drug dealer, and King, having fallen on hard times, offered to help Terry launder his drug money. As fortune would have it, Terry was posing as a drug dealer (he was a confidential informant in truth), and he told the police about King's offer.

The police arranged several meetings between the two. Terry secretly recorded each of them. In the meetings, Terry held himself out as a drug dealer who had substantial sums of money that needed laundering. He explained to King that he had drugs shipped in from Mexico and that his product was "a hundred percent pure." R. 37-3 at 9. But he liked to "keep [his] hands off as much as possible" to avoid detection. *Id.* Hence he didn't sell the product at the "street level" but had others do it for him. *Id.*

None of what Terry said was true. But the jury took what King said in response to be true and to reflect his genuine desire to launder drug proceeds. The recordings caught King proposing to imitate what he had seen on *Breaking Bad* to launder money. One option he had seen was to use a sham corporation as cover. The corporation should be an entertainment business, he said, because entertainment businesses are "cash heavy." R. 37-2 at 12. He also suggested funneling money through his IOLTA account, an interest-bearing trust account used by attorneys to hold client money for future use. Under this approach, King would provide Terry with fictitious legal services, deduct payments from the account, and return whatever money was left to Terry.

They agreed to use the IOLTA account approach. Terry told King he would give him around $30,000 to "clean" after selling two kilograms of cocaine. R. 37-2 at 14. He eventually brought King $20,000. King accepted the money and promised to deposit it in his IOLTA account and to return it a few thousand dollars at a time. True to his word, King gave Terry a check for $2,000 in February and another check for the same amount in March.

The government charged King with two counts of money laundering and one count of attempted money laundering. The jury convicted King on all three counts, and the judge sentenced him to forty-four months in prison.

## II.

*Confrontation Clause.* King claims that the introduction of the recorded conversations between him and Terry violated his rights to confront the witnesses against him under the Sixth Amendment to the United States Constitution. He complained in particular about the absence of an opportunity to cross-examine Terry.

To establish a Confrontation Clause claim, the defendant must as an initial matter establish that the government used an out-of-court statement for its truth. *Michigan v. Bryant*, 562 U.S. 344, 369 (2011). That did not happen here. To convict King of money laundering, the government had to prove (among other things) that the laundered money was "represented to be the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(3). The government introduced the recorded conversations between Terry and King to prove what was "represented," not whether it was true. Here is a typical exchange:

> [Terry]: Look, right now, between tomorrow, and probably like Saturday, Sunday, . . . my last 2 keys of coke will be moved. I can bring you 30 next week.
> [King]: To clean it?
> [Terry]: Yea.
> [King]: Alright, I'll have to figure out where I'm gonna put that. . . . I can put it in my IOLTA.

R. 37-2 at 14.

The prosecution did not offer Terry's statements for their truth—to show that Terry could obtain $30,000 from selling two kilograms of cocaine. Terry was not in fact a drug dealer, and

the money exchanged was not in fact from drug sales. This was a sting operation after all. The prosecution used Terry's statements to show that Terry *represented* the money to be drug money and that King *believed* him.

So too of another exchange, also representative of the way the government used the recordings at trial:

> [Terry]: I have coke shipments that come in this time, my heroin shipments come this time. Cause I-I do both. . . . No one up here can get the quality that I have. I have a hundred percent pure. It's counted here uncut. So my people cut it and at least make it at least street level. . . . Now, when it comes in, I'm not-I don't usually go to the meets. Ok. But, I got other people that do. You know, cause I try to keep my hands off as much as possible. . . .
> [King]: Right. But you want to keep that circle small.
> [Terry]: Ok. I'll say no more than four, five.
> [King]: Yeah. . . . Eventually you're gonna wanna get me their names so that I can constantly check to make sure that I can pinch. Cause what I'll do is I'll just constantly run em through county and city of Cleveland every day, or every other day, . . . to see if they get traffic tickets, whatever. . . . Because, that's how things fall apart. Somebody close to you gets pinched and then . . . they talk.

R. 37-3 at 8–9.

Here also the prosecution did not offer Terry's statements for their truth. It did not introduce the statements to prove that Terry was awaiting shipments of "uncut" drugs. Nor did it use them to show that Terry was a drug kingpin rather than a low-level dealer. As with the first example, the prosecution introduced these statements to show that Terry held himself out as a drug dealer and that King believed him. The admission of these statements, and the other like-used statements, did not violate the Confrontation Clause.

King does not quibble with what we have said so far. He acknowledges that the prosecution introduced these statements to show representation and belief. *See* Appellant's Br. at 11–12. What he argues instead is that Terry's statements were "offered for the truth of the matter asserted, because they went directly to establishing an element of the offense." *Id.* at 11. Because representation is an element of the money laundering offense, *see* 18 U.S.C. § 1956(a)(3), he reasons, the prosecution must have offered Terry's statements for their truth.

That's not how it works.  Recall the first excerpt from above.  "My last 2 keys of coke will be moved" shows that Terry represented to King that his money was drug money.  Yes, the statement helps establish an element of the offense.  But that's because the jury could infer that Terry represented his money as drug money regardless of whether the statement was true, regardless in other words of whether Terry did indeed have "2 keys of coke [to] be moved."

Now imagine Terry saying something else.  "Terry:  Two years ago, you helped my friend Jerry launder money by setting up an entertainment business.  Do you remember?  King: Yes."  Here, Terry's statement is not used to prove an element of the offense.  But if the prosecution introduces the statement to prove that King indeed helped Jerry launder money by funneling it through a fake entertainment business, it would be offering the statement for its truth.  Sometimes an out-of-court statement will help establish an element of the offense; sometimes it will not.  But that happenstance does not tell us whether the government used the statement to establish the truth of the matter asserted.

That's just how *Tennessee v. Street*, 471 U.S. 409 (1985), looked at it.  The defendant claimed that the police had coerced him into adopting the confession of his alleged accomplice. To rebut the claim, the prosecution introduced the accomplice's confession to show the jury that it differed from the defendant's.  The Court upheld the admission of the confession because the district court instructed the jury not to consider it for its truth but only for the purpose of comparing it to the defendant's confession.  It made no difference to the Court that the accomplice's confession implicated the defendant and helped establish an element of the offense. *Id.* at 417.

King seeks support from *United States v. Powers*, 500 F.3d 500 (6th Cir. 2007).  But it offers no aid.  During a sting operation, a confidential informant pointed to the defendant and told police "that was him" after the defendant drove by.  *Id.* at 504 n.3.  The introduction of the statement, we held, violated the Confrontation Clause.  *Id.* at 509.  But that was not, as King claims, because the statement "went directly to establishing an element of the offense":  identity. Appellant's Reply Br. at 7.  As we explained, the defendant's confrontation rights were violated because "[t]he prosecution offered the [informant's] positive identification of the Defendant for the truth of the matter asserted, namely, that Defendant was the 'target' with whom the

[informant] had intended to set up the sting operation." *Powers*, 500 F.3d at 509. That the statement potentially established an element of the offense had nothing to do with it.

*Prior bad act.* King separately argues that the district court erred when it allowed the prosecution to introduce evidence of his prior arrest for cocaine possession. We agree, but the error was harmless.

At trial, King took the stand in his own defense. On cross-examination, the following exchange occurred:

> [Prosecutor]: And at some point in time you left the Cuyahoga County Prosecutor's office, right?
> [King]: That is correct. . . .
> [Prosecutor]: And it's fair to say that the circumstance under which you left the Cuyahoga County Prosecutor's office were less than favorable; is that not correct?
> [Defense counsel]: Objection, your Honor.
> [The court]: Overruled.
> [Prosecutor]: Isn't it a fact, Mr. King, that you were asked to leave the Prosecutor's office because you were arrested over on West 6th Street with cocaine in your pocket?
> [King]: No, that's not correct at all. That's totally incorrect.
> [Prosecutor]: You did not plead to a misdemeanor because of cocaine possession?
> [Defense counsel]: Objection, your Honor, misdemeanor, objection.
> [The court]: Overruled.
> [King]: I'd be more than happy to answer. I left the Prosecutor's office in 2004. In 2004, I wasn't arrested for cocaine possession. I was arrested for cocaine possession in 2007.

R. 52 at 182–83.

King claims that this line of questioning violated Rule 404(b) of the Federal Rules of Evidence. "Evidence of a crime, wrong, or other act," it says, "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The rule prohibits the government from using evidence of King's prior arrest to prove that King had a propensity for breaking the law. *See United States v. Mack*, 729 F.3d 594, 601 (6th Cir. 2013). Best we can tell, there was no ground for introducing King's

prior arrest other than to show he had the propensity to commit crimes. For that reason, we think the district court should have excluded it. *See id.* at 602–03.

The government demurs. It argues that the prosecution used King's arrest to contradict two statements that King made on the stand: (1) that he left his old job on good terms, and (2) that he was sober by 2007. As to the first theory, King never claimed to have left his old job on good terms. There was nothing to contradict. As to the second theory, the prosecution could not have introduced King's arrest to contradict his claim that he was sober in 2007 because the prosecutor mistakenly thought that King was arrested in *2004*.

The government makes one additional argument: King "opened the door to cross-examination concerning his prior arrest" when he testified about his history of substance abuse to garner juror sympathy. Appellee's Br. at 28–29. But the arrest does not contradict this evidence; it is consistent with it.

For the same reason, any error was harmless. The arrest evidence was consistent with King's own testimony about his history of substance abuse. And the evidence of King's guilt at any rate was "overwhelming." *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011). He was caught on tape brainstorming schemes to launder drug money, accepting that money, and then returning it after it was "cleaned." This evidence "eliminat[es] any fair assurance that the conviction was substantially swayed by" a potential 404(b) error. *Id.* King was not convicted on the basis of his prior cocaine arrest. He was convicted on the basis of his actions.

For these reasons, we affirm.