In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-19-00238-CR**

**DEMARCUS ANTWON CHATMON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 18-30651**

## MEMORANDUM OPINION

After a jury found him guilty on an indictment alleging that Chatmon assaulted a woman while using a deadly weapon, Demarcus Antwon Chatmon appealed.[1] On appeal, Chatmon filed a brief raising three issues. In the first two of his issues, Chatmon argues the trial court violated his right to confront the witnesses

---

[1] *See* Tex. Penal Code Ann. §§ 22.01(a)(1), 22.02(a)(2). Additionally, the record reflects that Demarcus Antwon Chatmon is also known as Demarcus Wayne Chapman, Demarcus Chatmon, Demarcus A. Chatmon, Demarcus Wayne Chapmon, and Demarcus Antoine Chapmon.

who testified against him when the court admitted recordings from a 911 call and a recording from a police officer's body-camera into evidence in his trial. All three recordings have statements in them that were made by witnesses whom the State failed to call to testify during Chatmon's trial.[2] In issue three, Chatmon argues the trial court violated his rights by supplementing the charge with an additional instruction after final argument in the case had commenced.[3] Because Chatmon's arguments lack merit, we will affirm.

## Background

In October 2018, several police officers from the Beaumont Police Department were dispatched to a home following the report that a shooting had occurred on San Jacinto Street in Beaumont, Texas. Before some of the officers who responded to the scene entered the home, Chatmon's mother, while standing outside the home's front door, asked the officers who were standing outside the house not to shoot Chatmon and she would get him to surrender to the police. When Chatmon came out he surrendered, and the police took him into custody. While some of the officers secured Chatmon, two others entered the residence. They found *Mika*, Chatmon's sister-in-law, inside. They also discover that Mika had suffered a gunshot

---

[2]*See* U.S. CONST. amend. VI.
[3]Tex. Code Crim. Proc. Ann. art. 36.16.

2

wound to her abdomen.[4] The officers who are outside the home also find a .45 caliber pistol in the front yard.

About a month later, a Jefferson County grand jury indicted Chatmon for aggravated assault. The indictment alleges that Chatmon knowingly, intentionally, or recklessly shot Mika with a gun. In June 2019, the case went to trial. Chatmon pleaded not guilty. In opening statement, the prosecutor told the jury the State faced the "difficult task of trying to prove this aggravated assault without the cooperation of [Mika]." When presenting its case, the State did not call any witnesses who testified during the trial that they were inside the home and saw the shooting when it occurred. Instead, the State called three Beaumont police officers, Jason Alpers, Andrew Carrier, and Jeremy Shoemaker, some of the officers who went to Chatmon's home in response to the 911 calls for assistance, to testify in Chatmon's trial. The State also called Lindsey Macha, an investigator who participated in the investigation of the shooting in her capacity as an employee of the City of Beaumont's Criminal Investigations Division.

---

[4]Because the Texas constitution grants crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process," we use a fictitious name to identify the individual identified in the indictment as the victim of the alleged crime. *See* Tex. Const. art. I, § 30.

On appeal, Chatmon complains about three recordings the trial court admitted into evidence over Chatmon's objections to them in his trial. He argues all three recordings contain testimonial statements made by witnesses who never testified in his trial, arguing that admitting their testimony violated his right to confront the witnesses who testified against him in his trial.

One of the recordings is a 911 call, placed by Terry Cartwright, Chatmon's brother. In that recording, Cartwright tells the 911 operator that his brother (a brother he never names) shot their sister-in-law. Chatmon also complains about the second of the 911 calls the trial court admitted into evidence in the trial. It contains statements made by Billy Ware Jr., who called 911 from a shop near Chatmon's home. This recording reflects that, when Ware called 911, he told the 911 operator that Deterrick Cartwright (a person Chatmon's mother testified is Chatmon's brother) came up to him seeking his help because someone at Chatmon's home had been shot. In the recording, Ware never identifies Chatmon as the person who shot Mika.

In addition to complaining about these two 911 recordings, Chatmon complains the trial court erred by admitting some of the footage taken from a body camera worn by Officer Shoemaker while at the scene. The footage the jury saw begins with Officer Shoemaker and other officers standing in the driveway of Chatmon's home while Chatmon's mother is offering to surrender Chatmon to the

4

police. Neither Chatmon's mother, nor Chatmon, state in the footage that Chatmon shot the person the police find a short time later after entering Chatmon's home. The footage the jury saw also shows that Officer Shoemaker and another officer entered Chatmon's home while other officers, who are outside the home, are securing Chatmon at the scene.

In the footage depicting what happened when Officer Shoemaker first enters the home, Mika is seen bending over near a passage as Officer Shoemaker and another officer go inside. Mika is hysterical. She can be heard screaming for help. She volunteers: "Why did he do this to me?" Officer Shoemaker assures Mika that he has an ambulance on the way. When Officer Shoemaker asks Mika to sit down, she moves out of the way. When she moves out of the passage, two other officers that followed Shoemaker into the home are seen as they disappear from view when they enter another room of the home. Apparently, the officers are searching the house to determine whether others are still inside. Officer Shoemaker, however, stays with Mika. She is heard complaining her legs are going numb. Officer Shoemaker asks Mika to "stay with me."

Before the officers who entered the home behind Officer Shoemaker return to the room where Officer Shoemaker is standing with Mika, Officer Shoemaker asks Mika: "What happened?" Mika replies: "He just [went] around shooting." Next, Officer Shoemaker asked Mika: "Who?" Mika responds: "That boy." About twenty

second later, the officers who searched the back part of the house return to the room where Officer Shoemaker is attempting to assess the situation on the scene. None of the officers who return to the room can be heard stating, while in Officer Shoemaker's presence, that they have secured the home. At that point, Officer Shoemaker calls the dispatcher by using a mic attached to the equipment he is carrying on his uniform. Officer Shoemaker tells the dispatcher that Mika suffered a gunshot to her abdomen. He then asks Mika: "How many shots did you hear." Mika responds: "He shot twice. . . he just went around shooting." Officer Shoemaker asks: "Who." Mika answers: "Demarcus Chatmon."

After the State rested, Chatmon called two witnesses to testify in his defense, Phyllis Mathis (Chatmon's mother) and Billy Ware Jr. (whom Cartwright approached and asked to call 911). Mathis testified first. She testified she has eight sons. She testified she didn't know which son shot Mika. Explaining why she surrendered Chatmon, Mathis testified that she had Chatmon come outside and surrender after she saw the police approaching the house after drawing their guns. According to Mathis, she didn't want Chatmon killed as the police were entering the home.

Billy Ware Jr. was Chatmon's next witness. Ware testified he was working at a shop near Chatmon's home when he heard the sound of gunfire from a location somewhere near the shop. Shortly after hearing the gunfire, Ware saw Chatmon's

6

brother, Terry Cartwright, running towards the shop. Cartwright approached Ware, stated he needed help, and said someone had been shot. Ware called 911. After calling 911, Ware went to Chatmon's house. Ware explained he watched the house from across the street along with several other onlookers who came to the scene. Ware also testified he knew that a party had been going on at Chatmon's home the day of the shooting. According to Ware, everyone attending the party was "doing drugs." Ware also testified he saw the police take Chatmon into custody while he was watching the home. According to Ware, Chatmon was on drugs and did not appear to be in "his right state of mind" based upon what he saw when the officers took Chatmon from the scene.

After the trial court read the charge, Chatmon's attorney began final argument. The original charge, which the trial court read to the jury, does not contain any instructions about voluntary intoxication and whether voluntary intoxication is a defense to an indictment charging a defendant with a crime. In final argument, Chatmon's attorney argued: "No one claimed that Chatmon was in his right state of mind [or] knew what he was doing." Then, Chatmon's attorney argued that when the shooting occurred, Chatmon "was gone; he was out of it." The prosecutor objected to the argument, suggesting it was improper because it implied "voluntary intoxication as a defense." The trial court sustained the objection. Next, the trial court advised the attorneys the court intended to give the jury a supplemental

instruction on the law of voluntary intoxication. Chatmon objected, arguing he never suggested to the jury that voluntary intoxication was a defense. Chatmon also argued it was "inappropriate to change the charge now." The trial court overruled the objections and gave the jury the supplemental instruction now at issue in Chatmon's appeal. The supplemental instruction states: "Voluntary intoxication does not constitute a defense to the commission of a crime."[5] The trial court reduced the oral instruction to writing and included it in the written charge the jury took with it to use when deliberating on a verdict.

When the jury returned, it found Chatmon guilty of aggravated assault. In the punishment hearing that followed, the jury found that Chatmon should serve a fifty-five-year sentence.[6] The trial court pronounced a fifty-five-year sentence and Chatmon appealed.

## Issues One and Two

In Chatmon's first two issues, he complains the trial court violated his rights under the Confrontation Clause by admitting recordings that he claims contain testimonial statements from Cartwright, Ware, and Mika since the State never called

---

[5]*See* Tex. Penal Code Ann. § 8.04(a).

[6]Generally, aggravated assault with a deadly weapon is a second-degree felony. *See id.* § 22.02(b). But based on the enhancement findings, the sentencing range that applies to Chatmon's punishment is 25 to 99 years (or life). *See id.* § 12.42(d).

them to testify in his trial.[7] He argues the State used the recorded statements in the trial to prove he is the person who shot Mika. We address issues one and two together, since both require us to decide whether the statements in the recordings, when viewed objectively, are *testimonial*.[8]

When the defendant complains on appeal that the trial court erred by admitting a testimonial statement, the standard of review requires the court reviewing the appeal to defer to the determination the trial court made on matters of historical fact and credibility as those matters affect the admissibility of the recording while reviewing the trial court's ultimate finding on whether the statement was testimonial using a *de novo* standard of review.[9]

Chatmon's appeal hinges on whether the statements in the three recordings are or are not testimonial. Under the Sixth Amendment, a defendant tried in a criminal case has the right "to be confronted with the witnesses against him."[10] But the Sixth Amendment does not prohibit the admission of statements made outside of the trial court if they are not *testimonial*.[11] And the circumstances under which each respective statement at issue was made controls whether that statement is or is not

---

[7]*See* U.S. CONST. amend. VI.
[8]*See Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).
[9]*Id.*
[10]U.S. CONST. amend. VI.
[11]*See Davis v. Washington*, 547 U.S. 813, 821 (2006); *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011).

testimonial. Generally, statements are not considered testimonial if the facts show the police obtained them while assisting in an ongoing emergency and the questions asked by the public officials are the types of questions that someone would ask to bring an emergency situation to an end.[12]

Thus, in *Davis*, the United States Supreme Court held the Confrontation Clause did not apply to a 911 recording when the circumstances surrounding the recording showed, from an objective point of view, that (1) the 911 caller spoke about events as they actually occurred rather than describing past events, (2) the 911 caller faced an ongoing emergency when the statements were made, (3) the questions asked in the 911 call were designed to resolve an ongoing emergency and were not asked to allow the police to elicit the information police need to investigate a crime, and (4) the level of formality, as shown by the objective evidence relevant to the recording, is lower than the formality that exists when police interview witnesses after the emergency ends.[13]

We apply the *Davis* factors to the recordings Chatmon complains about in his appeal. All three recordings show the 911 operator and Officer Shoemaker asked questions like those public officials typically ask to bring an ongoing emergency to an end. For instance, when Ware and Cartwright called 911, the shooting had just

---

[12] *Davis*, 547 U.S. at 822.
[13] *Id*. at 827.

10

occurred. The purpose for the calls, as shown by the objective evidence in the recordings, was to notify the police that an emergency had occurred and that emergency assistance was needed at Chatmon's home. When Officer Shoemaker spoke to Mika, Mika is in obvious pain from the gunshot wound she had suffered to her abdomen and in need of emergency care. When the conversation with Mika begins, no one, including Mika, has yet identified Chatmon as the shooter. While it's true that Officer Shoemaker knew Chatmon had been detained by the officers outside the home, no one had identified him as the shooter and Chatmon never told the police he is the person who shot the person police found in the home. In other words, the emergency was still ongoing when Officer Shoemaker entered the home and talks to Mika and the shooter had not been identified, until Mika identified her shooter as Chatmon. Consequently, the objective threat that the officers and Mika were facing from Officer Shoemaker's standpoint had not ended until after Mika identified Chatmon as the person who shot her.[14]

The objective information in the record reflects that the questions the 911 operator and Officer Shoemaker asked are the types of questions public officials generally ask to bring an emergency to an end.[15] For example, the 911 operator wanted to know what happened, who was involved in the shooting, and where the

---

[14]*See Michigan v. Bryant,* 562 U.S. 344, 349, 377-78 (2011) .
[15]*Davis*, 547 U.S. at 822; *see also Bryant*, 562 U.S. at 364-65.

11

shooting occurred.[16] The same is true of the questions that Officer Shoemaker asked Mika. Simply put, the questions they asked are like those public officials use to bring the emergency due to a reported shooting to an end.[17]

To be sure, the police had Chatmon in custody when Officer Shoemaker encountered Mika in the home. Yet Officer Shoemaker could not have known whether Chatmon was the shooter before Mika told him that he was the person who shot her. Accordingly, we conclude that all three recordings are not testimonial. It follows the trial court did not violate Chatmon's right to confront his accusers in his trial by admitting the recordings into evidence.[18] Chatmon's first and second issues are overruled.

The Supplemental Charge

In issue three, Chatmon argues the trial court erred when it supplemented the charge with additional instructions after allowing final argument in the trial to begin. We use a two-step process to analyze complaints alleging there is error in a court's charge.[19] In step one, we determine whether the instruction that the defendant is

---

[16]*Bryant*, 562 U.S. at 376.
[17]*See Bryant*, 562 U.S. at 349, 376-377; *Davis*, 547 U.S. at 831.
[18]*See Bryant*, 562 U.S. at 361.
[19]*See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012).

complaining about in the appeal was erroneous.[20] If not, the analysis ends.[21] If erroneous, however, we address whether the error caused harm.[22]

Chatmon's complaint about the trial court's decision to supplement the charge is based on article 36.16 of the Texas Code of Criminal Procedure.[23] That provision generally prohibits trial courts from supplementing the charge once final argument in a case begins.[24] But exceptions exist to the rule, and they are set out in article 36.16.[25] One exception allows trial courts to give the jury a "further charge" should any party to the case present an "improper argument" in final argument.[26] That exception applies here. The record shows Chatmon's attorney invited the supplemental instruction by making an argument that implies the jury should consider the fact Chatmon was intoxicated when it was evaluating whether Chatmon, when he shot Mika, acted intentionally, knowingly, or recklessly.[27] We conclude the trial court did not err by finding the argument Chatmon's attorney made in final

---

[20]*Id.*
[21]*Id.*
[22]*Id.*
[23]Tex. Code Crim. Proc. Ann. art. 36.16.
[24]*Id.*
[25]*Id.*
[26]*Id.*
[27]*Taylor v. State*, 885 S.W.2d 154, 158 (Tex. Crim. App. 1994) (holding the trial court may instruct the jury that involuntary intoxication is not a defense if the evidence before the jury would allow the jury to infer the "defendant's intoxication somehow excused his actions[,]" regardless of whether the defendant made that argument in the trial).

argument was improper. It follows the trial court did not err by supplementing the charge.[28] Because Chatmon's third issue lacks merit, it is overruled.

## Clerical Error

The trial court's judgment states that Chatmon was convicted of a first-degree felony. That recitation, however, is incorrect. The jury found Chatmon guilty of aggravated assault, which as alleged in Chatmon's indictment, is a second-degree felony—not a first.[29] That said, the error is a clerical error. And we may correct clerical errors to make judgments speak the truth.[30] Our authority to correct clerical errors also does not require anyone to request the trial court to correct the error before we may correct it on appeal.[31] Because the recitation stating that Chatmon was convicted of a "1ST DEGREE FELONY" is incorrect, we modify the judgment to make it recite that Chatmon was convicted of a second-degree felony. We do so by deleting the recitation in the judgment stating that Chatmon committed a "1ST DEGREE FELONY," and we replace those words with "2ND DEGREE FELONY."

---

[28]*See* Tex. Penal Code Ann. § 8.04(a) (providing that "[v]oluntary intoxication does not constitute a defense to the commission of crime").

[29]*See id.* § 22.01(b) (subject to exceptions that do not apply under the circumstances of Chatmon's case, making the aggravated assault of another with a deadly weapon punishable as a second-degree felony).

[30]Tex. R. App. P. 43.2(b); *see also Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993).

[31]*Asberry v. State*, 813 S.W.2d 526, 529-30 (Tex. App.—Dallas 1991, pet. ref'd).

Conclusion

Having overruled Chatmon's issues and reformed the judgment, we affirm the judgment as reformed.

AFFIRMED AS REFORMED.

_____
HOLLIS HORTON
Justice

Submitted on March 24, 2021
Opinion Delivered June 9, 2021
Do Not Publish

Before Golemon, C.J., Kreger and Horton, JJ.

15